UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

TROY C. WALLACE, *et al.*,

        Plaintiffs,

        -against-

STATE OF NEW YORK, *et al.*,

        Defendants.

------------------------------------------------------------------x

**MEMORANDUM & ORDER**

12-CV-5866 (PKC)

PAMELA K. CHEN, United States District Judge:

**TABLE OF CONTENTS**

I.  Background ............................................................................................... 5

   A.  *Plaintiffs* ........................................................................................... 5

     1.  Troy Wallace ............................................................................. 6

     2.  Marcello Aiello, Jr. .................................................................. 7

     3.  Robert Blunt ............................................................................. 7

     4.  Earl Calloway .......................................................................... 8

     5.  Jehovah Colon ......................................................................... 8

     6.  Joshua Factor ........................................................................... 9

     7.  Richard Geoffrion .................................................................... 9

     8.  Charles McLaurin .................................................................... 9

     9.  Angel Tirado .......................................................................... 10

   B.  *The Laws* ....................................................................................... 10

     1.  State Registration Requirements ........................................... 10

     2.  The State, County, and Town Residency Restrictions ........... 14

       i.  State ............................................................................. 14

       ii.  County .......................................................................... 15

       iii.  Town ........................................................................... 16

    *C.   Procedural History and Claims* ........................................................................... 18

II.   Discussion ............................................................................................................. 20

    *A.   Standard of Review* ........................................................................................ 20

    *B.   Article III Standing* ...................................................................................... 21

        1.   Standing to Challenge the State Registration Requirements ...................... 23

        2.   Standing to Challenge the State Residency Restrictions ............................. 25

        3.   Standing to Challenge the County and Town Residency Restrictions ........................ 29

        4.   Standing to Challenge the County's Trailer Program ................................... 31

    *C.   The State's Motion to Dismiss* ....................................................................... 32

        1.   Statute of Limitations ................................................................................... 32

        2.   Eleventh Amendment Immunity .................................................................. 35

        3.   Failure to State a Claim ................................................................................ 38

            i.   *Ex Post Facto* Claim Relating to the Current State Registration Requirements ...... 40

            ii.   *Ex Post Facto* Claim Relating to the State Residency Restrictions ......................... 48

    *D.   The Other Parties' Motions to Dismiss* ......................................................... 65

        1.   Preemption Claims Regarding the County and Town Residency Restrictions ............. 65

        2.   Failure to State a Claim ................................................................................ 67

            i.   *Ex Post Facto* Claims Relating to the County and Town Residency Restrictions ... 67

            ii.   Equal Protection Claim Relating to the County's Trailer Program ......................... 78

        3.   Pendent Jurisdiction .................................................................................... 82

III.   Conclusion ........................................................................................................... 83

In this case ("*Wallace*"),[1] nine individuals ("Plaintiffs") claim that New York State sex offender registration requirements and residency restrictions punish them retroactively for offenses they already committed and, thus, violate the *Ex Post Facto* Clause of the Constitution (Article I, Section 9, Clause 3); and that similar residency restrictions under County and Town

---

[1]    This matter is comprised of 15 other separately-filed lawsuits that have been consolidated with the lead case, *Wallace*: 13-CV-154, 13-CV-1301, 13-CV-1303, 13-CV-1310, 13-CV-1501, 13-CV-1503, 13-CV-1504, 13-CV-1505, 13-CV-1506, 13-CV-1631, 13-CV-1633, 13-CV-1634, 13-CV-1636, 13-CV-2646, and 13-CV-2647. Briefing on motions to dismiss in these consolidated cases was stayed pending the resolution of the *Wallace* motions to dismiss.

laws are not only unconstitutional, but preempted by state law. (Dkt. No. 5 ("Am. Compl.") ¶¶ 1-3.) Plaintiffs also claim that, as a result of the County residency restrictions, they are, or have been, homeless and relegated to County-run trailers, subject to living conditions that infringe upon their Fourteenth Amendment right to equal protection under the law. (*Id.* ¶¶ 45-46.)

Defendants—the State of New York (the "State")[2]; the County of Suffolk (the "County") and Susan Westergaard, in her official capacity on behalf of the Suffolk County Department of Social Services[3] (the "County DSS") (collectively, the "County Defendants")[4]; Mark Epley, in

---

[2] The Amended Complaint in *Wallace* (the "*Wallace* Complaint") also names the Commissioner of the New York State Department of Social Services as a Defendant. (Am. Compl., at 1.) The Court accepts as true the State's representation, which Plaintiffs do not dispute, that, as of 1997, that department ceased to exist. (Dkt. No. 79-1 ("State Br."), at 1 n.1.) The New York State Department of Social Services, therefore, is dismissed from this case.

[3] The caption on the docket suggests that Westergaard is being sued individually *and* in her official capacity; the *Wallace* Complaint, however, indicates that Westergaard is being sued only in her official capacity (*see* Am. Compl. ¶ 45 ("Ms. Westergard [sic] has acted in her official capacity[.]")). The Clerk of the Court should amend the caption accordingly.

The official-capacity claim against Westergaard is, substantively speaking, a claim against the County DSS. *See Ky. v. Graham* ("*Graham*"), 473 U.S. 159, 166 (1985) (Marshall, J.) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) (noting that a suit against an individual "in his official capacity as Commissioner of [Oneida County Department of Social Services]" is "equivalent to a suit against [the department] and Oneida County"). But, since the County DSS is a "mere[] administrative arm[]" of the County, lacking a "legal identity separate and apart from the municipality," and cannot be sued, this claim instead should be construed as a claim against the County, which is already a Defendant. *Allen v. Nassau Cnty. Exec. Office*, No. 09-CV-1520, 2011 WL 1061019, at *7 (E.D.N.Y. Feb. 15, 2011) (quotations omitted) (replacing the "Nassau County Department of Social Services" and other entities with the "County of Nassau," for purposes of the plaintiff's civil rights claims), *report-recommendation adopted sub nom. Allen v. Suozzi*, No. 09-CV-1520, 2011 WL 1059147 (E.D.N.Y. Mar. 21, 2011).

[4] The parties believe that the County DSS and its former commissioner, Gregory Blass, in his official capacity, are named separately in the *Wallace* Complaint. (Dkt. No. 69-4 ("County Defs. Br."), at 1; *see also* Dkt. No. 67 ("Pls. Opp."), at 1, 6 (referencing the "[Suffolk County] Department of Social Services" as one of the "named defendants," and alleging that "[t]he Department of Social Services, *by and through its former Commissioner Gregory Blas* [sic] implemented Suffolk County's homeless sex offender trailer program") (emphasis added).) Although the complaints in other cases consolidated with *Wallace* appear to name these parties,

3

his official capacity as Mayor on behalf of the Town of Southampton[5] (the "Town")[6]; and

Alexander Roberts, in his official capacity as Executive Director of Community Housing

Innovations, Inc. ("CHI")—move the Court to dismiss the claims against them in the *Wallace*

---

*see, e.g.*, Complaint, *Marvin v. Cnty. of Suffolk*, No. 13-CV-154 (E.D.N.Y. Jan. 7, 2013), ECF No. 1; the *Wallace* Complaint does not. Even assuming that the *Wallace* Complaint were to name these parties, the claims against them would amount to claims already asserted against the County. *See supra* note 3.

[5] The caption on the docket suggests that Epley is being sued individually *and* in his official capacity; although the *Wallace* Complaint does not provide any contrary indication that Epley, like Westergaard, is being sued only in his official capacity, Plaintiffs' opposition brief does (*see* Pls. Opp., at 2 (characterizing the *ex post facto* claim as against "[t]he Town of Southampton *by and through its mayor, Mark Epely* [sic]") (emphasis added)). *See Graham*, 473 U.S. at 167 n.14 ("In many cases, the complaint will not clearly specify whether officials are sued personally, in their official capacity, or both. *'The course of proceedings' in such cases typically will indicate the nature of the liability sought to be imposed.*") (emphasis added) (quoting *Brandon v. Holt*, 469 U.S. 464, 469 (1985) (Stevens, J.)). The Clerk of the Court should amend the caption accordingly.

Because the claim against Epley is an official-capacity claim, it ought to be construed as a claim against the Town. *See supra* note 3; *see also Schubert v. City of Rye*, 775 F. Supp. 2d 689, 700 (S.D.N.Y. 2011) (holding that the "real party in interest" in "official-capacity suits against the Mayor," among other individuals, is the city); *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 449 n.4 (S.D.N.Y. 1998) ("The Court will consider plaintiffs' section 1983 against the Town employees in their official capacities as a claim against the Town under section 1983.").

A separate, though related, issue is that Plaintiffs mistakenly name Epley as the Mayor of *the Town*, rather than the Mayor of *the Village* of Southampton. (Dkt. No. 68-7 ("Epley Br."), at 1 n.1.) Even if this is the case, Plaintiffs plainly intended to name the individual in charge of the Town, in his official capacity. Were Plaintiffs to correct the mistake by amending the *Wallace* Complaint, their claim would still be an official-capacity claim with respect to the Town. *Cf. Delgado-Brunet v. Clark*, 93 F.3d 339, 344 (7th Cir. 1996) (Wood, J.) ("Mistakes in naming parties [for purposes of a *Bivens* action] are far less likely to have drastic consequences in official rather than individual capacity actions[.]"). The mistake, therefore, does not affect the Court's decision to dismiss the official-capacity claim relating to the Town, whether Epley or the correct individual is named. *See infra* Section II.D.

[6] Contrary to what the parties believe (*see* Epley Br., at 1; Pls. Opp., at 1), the Southampton Town Police was terminated as a Defendant on November 28, 2012, according to the docket. Assuming the Southampton Town Police is still a Defendant, it should be dismissed from this case, because it is an administrative arm of the Town, incapable of being sued separately. *See, e.g.*, *Santos v. Zabbara*, 984 F. Supp. 2d 106, 114 n.12 (E.D.N.Y. 2013) (collecting cases).

Complaint. (Dkt. Nos. 68-70; 79.) For the reasons set forth below, the Court grants Defendants'

motions in their entirety and dismisses the *Wallace* Complaint *with* prejudice, except Plaintiffs'

state law preemption claims as to which the Court declines to exercise supplemental jurisdiction

and dismisses *without* prejudice.

I.     Background

The Court takes the following facts from the allegations in the *Wallace* Complaint, which

are assumed to be true for purposes of Defendants' motions, and otherwise judicially-noticeable

information.  *See Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) ("When

determining the sufficiency of plaintiffs' claim for Rule 12(b)(6) purposes, consideration is

limited to the factual allegations in plaintiffs' amended complaint, which are accepted as true, to

documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of

which judicial notice may be taken, or to documents either in plaintiffs' possession or of which

plaintiffs had knowledge and relied on in bringing suit."); *see also Chambers v. Time Warner,

Inc.*, 282 F.3d 147, 153 & n.3 (2d Cir. 2002) (citing standard in *Brass* with approval as

"congruent with that of our sister Circuits").

In construing the claims in this case, the Court recognizes that, because Plaintiffs, as *pro

se* litigants, are to be afforded "special solicitude," the *Wallace* Complaint "must be construed

liberally and interpreted to raise the strongest [claims] that they suggest."  *Triestman v. Fed.

Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006) (per curiam) (quotations omitted).

A.  *Plaintiffs*

As an initial matter, the *Wallace* Complaint is incomplete, in terms of its allegations as to

(i) when, or if, Plaintiffs were convicted of a sex offense, released from prison, placed on

probation or parole, and/or classified as a specific risk-level[7] of sex offender; and (ii) where they live. (*See* State Br., at 2 n.3, 3, 14; Epley Br., at 2.) Such information, however, is available on the State's sex offender registry website (http://www.criminaljustice.ny.gov/nsor) and, thus, is judicially-noticeable. *See Zielinski v. DeFreest*, No. 12-CV-1160, 2013 WL 4838833, at *1 n.2 (S.D.N.Y. Sept. 10, 2013) ("While [a plaintiff in a *Bivens* action] does not allege his status [as a Level 2 sex offender], it is evident from the publicly available New York Sex Offender Registry, and accordingly, is a fact of which the Court may take judicial notice."); *see also U.S. v. Akinrosotu*, 637 F.3d 165, 168 (2d Cir. 2011) (per curiam) (taking judicial notice of the "[Bureau of Prisons's] projected date for the defendant's release from prison" on its "official website"); *Williams v. City of N.Y.*, No. 07-CV-3764, 2008 WL 3247813, at *2 & n.3 (S.D.N.Y. Aug. 7, 2008) (considering, on a motion to dismiss, the terms of the Section 1983 plaintiff's conviction and sentence, based on judicially-noticeable information "obtained on . . . the New York Department of Correction Services Inmate Population Information Search webpage").[8]

1. <u>Troy Wallace</u>

Plaintiff Troy Wallace committed first-degree sexual abuse (N.Y. Penal Law § 130.65) of a 15-year old female in October 1991. (Ex. A.) Wallace was convicted in April 1992, and is classified as a risk-level two sex offender. (*Id.*) Although Wallace was originally sentenced to six months in prison and five years of probation, his probation was revoked in August 1992, and

---

[7] Under the State's sex offender regime, convicted sex offenders are assigned a risk-level of one, two, or three (from least to greatest risk), based on a set of factors, including the offense for which they were convicted. N.Y. Correct. Law § 168-l.

[8] The information on this website, of which the Court takes judicial notice, is appended to the Court's decision as Exhibits A-I, because it may later become unavailable. *See* Adam Liptak, *In Supreme Court Opinions, Web Links to Nowhere*, N.Y. Times, Sept. 23, 2013 (reporting on the issue of "ephemeral" citations to internet sources, rather than citations to "static, permanent sources," and noting that the Ninth Circuit retains an archive of internet citations "in the PDF format").

he was resentenced to 18-54 months in prison. (Am. Compl. ¶¶ 4-6.) In November 1995, Wallace was released on parole; his maximum expiration date for parole was May 1997. (*Id.* ¶ 7.) Wallace is now on parole for a "non-sex related subsequent conviction." (*Id.*) Wallace has (i) listed a P.O. Box in Ronkonkoma in the Town of Islip, Suffolk County (*id.* at 20),[9] and (ii) registered a primary residence at a correctional facility in the Town of Riverhead, Suffolk County (Ex. A).[10]

### 2. Marcello Aiello, Jr.

Plaintiff Marcello Aiello, Jr. committed third-degree rape (N.Y. Penal Law § 130.25) of a 16-year old female in February 2007. (Ex. B.) Aiello was convicted in December 2009, and is classified as a risk-level two sex offender. (*Id.*) Aiello was sentenced to three years in prison, and has been released on parole with a maximum expiration date of January 13, 2027. (*Id.*) Aiello has (i) listed an address in Yaphank in the Town of Brookhaven, Suffolk County (Dkt. No. 5-1), and (ii) registered a primary residence at a correctional facility in the Town of Collins, Erie County (Ex. B).

### 3. Robert Blunt

Plaintiff Robert Blunt committed first-degree sexual abuse (N.Y. Penal Law § 130.65) of a 64-year old female in November 1999. (Ex. C.) Blunt was convicted in February 2000, and is classified as a risk-level three sex offender and a "[s]exually [v]iolent [o]ffender." (*Id.*) Blunt was sentenced to seven years in prison, and has been released on parole with a maximum

---

[9]    The towns in Suffolk and Nassau Counties are comprised of multiple villages, such as Ronkonkoma in the Town of Islip, Suffolk County. Some villages straddle more than one town, such as Holbrook in the Towns of Islip and Brookhaven, Suffolk County.

[10]    At the May 13, 2014 oral argument, Plaintiff Wallace alleged that, despite any address that he might have listed or registered, he has remained, in effect, homeless in Suffolk County. (Transcript of Oral Argument, dated May 13, 2014 ("Oral Argument Tr."), at 9:18-10:11.)

expiration date of September 25, 2017.  (*Id.*)  Blunt has (i) listed an address in West Babylon in the Town of Babylon, Suffolk County (Dkt. No. 5-2), and (ii) registered a primary residence at a correctional facility in the Town of Malone, Franklin County (Ex. C).

### 4. Earl Calloway

Plaintiff Earl Calloway committed first-degree rape and first-degree sexual conduct against a child (N.Y. Penal Law §§ 130.35, 130.75) in March 1999; the victim was a 10-year old female.  (Ex. D.)  Calloway was convicted in August 2000, and is classified as a risk-level three sex offender and a "[s]exually [v]iolent [o]ffender."  (*Id.*)  Calloway's sentence was eight years in prison; he has been released, but is not on parole.  (*Id.*)  Calloway has (i) listed a P.O. Box in Holbrook in the Towns of Islip and Brookhaven, Suffolk County (Dkt. No. 5-3),[11] and (ii) registered a primary residence in Freeport in the Town of Hempstead, Nassau County (Ex. D).

### 5. Jehovah Colon

Plaintiff Jehovah Colon (incorrectly appearing as "Cobin" on the docket)[12] committed first-degree attempted rape (N.Y. Penal Law § 130.35) of two females, an 8-year old and an 11-year old, in April 2001.  (Ex. E.)  Colon was convicted in July 2001, and is classified as a risk-level three sex offender and a "[s]exually [v]iolent [o]ffender."  (*Id.*)  Colon's sentence was 150 months (12 years and 6 months); he has been released, but is not on parole.  (*Id.*)  Colon has (i) listed an address in Patchogue (Dkt. No. 5-4), and (ii) registered a primary residence in Coram (Ex. E.).  Both Patchogue and Coram are in the Town of Brookhaven, Suffolk County.

---

[11] Like Plaintiff Wallace, Plaintiff Calloway, who also appeared for the May 13, 2014 oral argument, alleged that he is effectively homeless in Suffolk County.  (Oral Argument Tr., at 11:10-12:13.)

[12] The Clerk of the Court is directed to amend the docket accordingly.

### 6. Joshua Factor

Plaintiff Joshua Factor committed a second-degree criminal sex act (N.Y. Penal Law § 130.45) against a 14-year old male in August 2007. (Ex. F.) Factor was convicted in March 2008, and is classified as a risk-level two sex offender. (*Id.*) Factor was sentenced to three years in prison, and has been released on parole with a maximum expiration date of December 3, 2015. (*Id.*) Factor has (i) listed an address in Farmingville in the Town of Brookhaven, Suffolk County (Dkt. No. 5-5), and (ii) registered a primary residence at a correctional facility in the Town of Marcy, Oneida County (Ex. F).

### 7. Richard Geoffrion

Plaintiff Richard Geoffrion committed a felony sex offense, *outside of New York State,* against a 15-year old female in September 2000. (Ex. G.) Geoffrion was convicted out-of-state in June 2001, and sentenced to one year of probation. (*Id.*) Geoffrion is classified as a risk-level three sex offender. (*Id.*) Geoffrion has (i) listed an address in Holbrook in the Towns of Brookhaven and Islip, County of Suffolk (Dkt. No. 5-6), and (ii) registered a primary residence in Coram in the Town of Brookhaven, Suffolk County (Ex. G).

### 8. Charles McLaurin

Plaintiff Charles McLaurin (incorrectly appearing as "McLauren" on the docket)[13] committed and was subsequently convicted in February 1995 of first-degree sexual abuse (N.Y. Penal Law § 130.65) of two females, a 9-year old and an 11-year old. (Ex. H.) McLaurin is classified as a risk-level three sex offender. *(Id.)* McLaurin's sentence was two to four years in prison; he has been released, but is not on parole. (*Id.*) McLaurin has (i) listed an address in Bay

---

[13] The Clerk of the Court is directed to amend the docket accordingly.

Shore in the Town of Islip, Suffolk County (Dkt. No. 5-7), and (ii) registered a primary residence in Bellport in the Town of Brookhaven, Suffolk County (Ex. H).

9. Angel Tirado

Plaintiff Angel Tirado committed forcible touching (N.Y. Penal Law § 130.52) of a 14-year old female in September 2003. (Ex. I.) Tirado was convicted in January 2005, and is classified as a risk-level two sex offender. (*Id.*) Tirado's sentence was six months in prison; he has been released, but is not on parole. (*Id.*) Tirado has (i) listed an address in the Bronx (Dkt. No. 5-8), and (ii) registered a primary residence at a correctional facility in the State of Pennsylvania (Ex. I).

None of the above information suggests that Plaintiffs reside, or have ever resided, in trailers for homeless sex offenders, operated by the County DSS pursuant to a program known as "the County DSS's overnight placement facility." (Am. Compl. ¶¶ 45-46; County Defs. Br., at 1.) The *Wallace* Complaint, however, does allege that Plaintiffs were transported to the "secured premises of the property of Suffolk County jail *in Riverhead where such trailer program is located*," whereupon, like "prisoners," they did not enjoy the same rights as "other free men." (Am. Compl. ¶¶ 45-46 (emphasis added).)

B. *The Laws*

1. State Registration Requirements

On January 21, 1996, the State's Sex Offender Registration Act ("SORA"), codified as N.Y. Correct. Law § 168 *et seq.*, took effect. SORA, 1995 N.Y. Sess. Laws Ch. 192 (S. 11-B) (1995) (McKinney). SORA "requires sex offenders, after serving their sentences, to register with law enforcement officials, and provides for various degrees of public notification of the identity and address of these offenders." *Doe v. Pataki* ("*Pataki*"), 120 F.3d 1263, 1265 (2d Cir. 1997). To support its registration requirements and notification provisions, SORA also sets up a

system for classifying sex offenders as risk-level one, two, or three, based on a set of "factors." *Id.* at 1267-68 & n.5; *see also supra* note 7.

The preamble to SORA states:

> The legislature finds that the danger of recidivism posed by sex offenders, especially those sexually violent offenders who commit predatory acts characterized by repetitive and compulsive behavior, and that the protection of the public from these offenders is of paramount concern or interest to government. The legislature further finds that law enforcement agencies' efforts to protect their communities, conduct investigations and quickly apprehend sex offenders are impaired by the lack of information about sex offenders who live within their jurisdiction and that the lack of information shared with the public may result in the failure of the criminal justice system to identify, investigate, apprehend and prosecute sex offenders.

> The system of registering sex offenders is a proper exercise of the state's police power regulating present and ongoing conduct. Registration will provide law enforcement with additional information critical to preventing sexual victimization and to resolving incidents involving sexual abuse and exploitation promptly. It will allow them to alert the public when necessary for the continued protection of the community.

1995 N.Y. Sess. Laws Ch. 192 (S. 11-B), § 1.

SORA's registration requirements (the "State registration requirements") apply to any "sex offender" convicted, in prison, or on probation or parole, *as of January 21, 1996. Id.* § 2 (adopting N.Y. Correct. Law §§ 168-f, 168-g). As originally adopted, the requirements provided, among other things, that the period of annual registration would be:

- 10 years for a "sex offender"; and

- *at least* 10 years, with mandatory verifications every 90 days, for a "sex offender" who is designated a "sexually violent predator," then-defined as a sex offender (i) convicted of a "sexually violent offense,"[14] (ii) suffering a "mental abnormality," or (iii) classified as a risk-level three sex offender.

---

[14] As presently defined, a "sexually violent offense" includes, among other things, a conviction for any offense under N.Y. Penal Law §§ 130.35, 130.65, 130.75.

*Id.* (adopting N.Y. Correct. Law §§ 168-a, 168-h, 168-l). The requirements also provided that "*[a]ny sex offender* required to register pursuant to this article may be relieved of any further duty to register upon the granting of a petition for relief by the sentencing court." *Id.* (emphasis added) (adopting N.Y. Correct. Law § 168-o).

On March 11, 2002, the State registration requirements were amended. Act of Mar. 11, 2002, 2002 N.Y. Sess. Laws Ch. 11 (S. 6263-A), § 24 (2002) (McKinney). In particular, the period of annual registration was amended to reflect several newly-defined terms:

- 10 years for a "sex offender" (i) who is *not* designated (a) a "sexually violent offender," defined as a sex offender convicted of a "sexually violent offense," (b) a "sexual predator," defined as a sex offender convicted of a "sexually violent offense" and suffering from a "mental abnormality or personality disorder," or (c) a "predicate sex offender," defined as a sex offender previously convicted of another offense, *or* (ii) who, *as of March 11, 2002*, is classified as a risk-level one or two sex offender;

- lifetime for a designated "sexually violent offender" *or* "predicate sex offender"; and

- lifetime, with mandatory verifications every 90 days, for a designated "sexual predator" *or* a sex offender who, *as of March 11, 2002*, is classified as a risk-level three sex offender.

*Id.* §§ 1-2, 4, 13 (amending N.Y. Correct. Law §§ 168-a, 168-h). The right to petition for relief from "any further duty to register" was also amended to apply only to a sex offender who, *as of March 11, 2002*, is classified as a *risk-level three* offender and has been registered for at least 13 years. *Id.* § 22 (amending N.Y. Correct. Law § 168-o).

Finally, on January 18, 2006, the State registration requirements were amended again. Act of Jan. 18, 2006, 2006 N.Y. Sess. Laws Ch. 1 (S. 6409, A. 9472), § 6 (2006) (McKinney). The amendments, which remain in place today, apply to any sex offender (i) "registered or required to register immediately prior to" January 18, 2006, *i.e.*, individuals still subject to the

requirements as amended in March 2002; or (ii) "required to register on or after" January 18, 2006. *Id.* As amended, the period for annual registration is:

- 20 years for a "sex offender" who is *not* designated a "sexually violent offender," "sexual predator," or "predicate sex offender," *and* is classified as a risk-level one sex offender; and

- lifetime for a sex offender (i) who is designated a "sexually violent offender," "sexual predator," or "predicate sex offender," *or* (ii) who is classified as a risk-level two or three sex offender.

N.Y. Correct. Law § 168-h. The right to petition for relief from "any further duty to register," as amended, applies only to a *risk-level two* sex offender who is *not* designated a "sexually violent offender," "sexual predator," or "predicate sex offender," and has been registered for at least 30 years. N.Y. Correct. Law § 168-o.

To summarize, the State registration requirements changed after SORA was adopted. Starting in January 1996, the State required that convicted sex offenders register for 10 years, or—if designated a "sexually violent predator," for instance, due to a risk-level three classification—more than 10 years. All sex offenders could petition for relief.

As of March 2002, sex offenders classified as a risk-level one or two offender, who were not designated a "sexually violent offender," "sexual predator," or "predicate sex offender," were still required to register for 10 years; only sex offenders classified as a risk-level three offender, or those falling within one of the aforementioned designations, were required to register for life. The right to petition for relief was limited to a subset of risk-level three sex offenders.

Since January 2006, sex offenders still subject to the requirements as amended in March 2002, or subsequently required to register, have an extended 20-year duty to register, if they are classified as a risk-level one offender; or a lifetime duty, if they are either classified as a risk-level two or three offender or designated a "sexually violent offender," "sexual predator," or

"predicate sex offender."  Only specific risk-level two sex offenders retain the right to petition for relief.

2.  <u>The State, County, and Town Residency Restrictions</u>

i.  State

The State's Sexual Assault Reform Act, which went into effect on February 1, 2001, enacted new provisions, codified as N.Y. Exec. Law § 259-c(14) and N.Y. Penal Law § 65.10(4-a).  Sexual Assault Reform Act, 2000 N.Y. Sess. Laws Ch. 1 (S. 8238, A. 11538), §§ 7-8, 57 (2000) (McKinney).  These provisions, when originally adopted, only prohibited the presence of certain sex offenders "within the real property boundary line" of schools.  *Id.* §§ 7-8 (adopting N.Y. Exec. Law § 259-c(14) and N.Y. Penal Law § 65.10(4-a), both of which only incorporated "paragraph (a)" of the definition for "school grounds" in N.Y. Penal Law § 220.00(14)); N.Y. Penal Law § 220.00(14)(a).  The original provisions, in short, did not operate to preclude such individuals from residing near schools.  Additionally, these provisions only applied to sex offenders sentenced to probation or released on parole for an offense defined in Articles 130 ("Sex Offenses"), 135 ("Kidnapping, Coercion and Related Offenses"), 235 ("Obscenity and Related Offenses"), or 263 ("Sexual Performance by a Child"), or Section 255.25 ("Incest in the third degree"), of the New York Penal Law, *where* the victim of the offense was "under the age of eighteen at the time."  2000 N.Y. Sess. Laws Ch. 1 (S. 8238, A. 11538), §§ 7-8.

Eventually, as of September 1, 2005, the above provisions were amended to also prohibit the presence of certain sex offenders—and, in effect, to preclude their residence—within 1,000 feet *beyond* the "real property boundary line" of schools during school hours.  Act of Aug. 19, 2005, 2005 N.Y. Sess. Laws Ch. 544 (A. 8894), §§ 1-2, 4 (2005) (McKinney) (amending N.Y. Exec. Law § 259-c(14) and N.Y. Penal Law § 65.10(4-a) to incorporate the whole definition for "school grounds" in N.Y. Penal Law § 220.00(14)); *see* N.Y. Penal Law § 220.00(14) (defining

14

"school grounds" to include "any area accessible to the public located within one thousand feet of the real property boundary line comprising any such school").[15] In other words, by their operation, these provisions, as amended, have become statewide sex offender residency restrictions (the "State residency restrictions").

The September 2005 amendments also extended the State residency restrictions to cover any sex offender probationer or parolee who:

- is convicted of an offense identified in the original provisions; and

- *either* (i) commits the offense against a victim "under the age of eighteen at the time" *or* (ii) is classified as a risk-level three sex offender.

2005 N.Y. Sess. Laws Ch. 544 (A. 8894), §§ 1-2. In other words, after September 2005, a sex offender probationer or parolee is subject to these restrictions not only if he is convicted of a specific offense against a child, but also if he is convicted of a specific offense and classified as a risk-level three offender. These restrictions remain in effect today.

ii. County

The residency restrictions in the County Code Ch. 745, Art. 1 (originally Ch. 428, Art. 1) (the "County residency restrictions"), were adopted on February 7, 2006 (Loc. L. No. 12-2006); and subsequently amended on December 5, 2006 (Loc. L. No. 64-2006), December 1, 2009 (Loc. L. No. 42-2009), and February 1, 2011 (Loc. L. No. 14-2011). Suffolk Cnty., N.Y., Code ("Cnty. Code") ch. 745, art. 1, *available at* http://www.ecode360.com/14954996. The stated reasons for these restrictions are the following:

---

[15] *See also Williams v. Dep't of Corr. & Cmty. Supervision* ("*Williams*"), 979 N.Y.S.2d 489, 497 (Sup. Ct. N.Y. Cnty. Jan. 15, 2014) (explaining that the September 2005 amendments "expanded the definition [of school grounds] to either grounds and structures within the property line of a school, *or an area within 1,000 feet of the property line of a school*") (emphasis added).

. . . This Legislature hereby finds and determines that sex offenders pose an unreasonable threat to the safety and well-being of children.

. . . This Legislature also finds and determines that the County of Suffolk has gone to great lengths to protect the children of this County from sex offenders, such as requiring certain sex offenders to wear ankle bracelets so that law enforcement can determine their whereabouts.

. . . This Legislature further finds and determines that information is currently available to the public regarding these high-risk offenders, which information is available through the Internet and other sources.

. . . This Legislature finds that it is imperative that the County of Suffolk takes all steps necessary to protect the most vulnerable residents of the County.

*Id.* § 745-1.

Specifically, the County residency restrictions prohibit any convicted sex offender, as long as they are subject to the State registration requirements, from residing "within 1/4 mile[16] of the property line of [(i)] any school, including, but not limited to, any public or private nursery, elementary, middle or high school; or [(ii)] a licensed day-care center; or [(iii)] a playground; or [(iv)] an amusement park; or [(v)] the residence or principal place of employment of the victim(s) of their crime(s)." *Id.* §§ 745-2, 745-3. These restrictions, however, exempt the residences of sex offenders established prior to February 7, 2006; *or* prior to the erection of new schools, daycare centers, or playgrounds within 1/4 mile. *Id.* § 745-4.

### iii. Town

The residency restrictions in the Town Code Ch. 215, Art. 1 (the "Town residency restrictions"), were adopted on October 23, 2007 (Loc. L. No. 51-2007), and subsequently amended on December 11, 2007 (Loc. L. No. 60-2007). Town of Southampton, N.Y., Code ("Town Code") ch. 215, art. 1, *available at* http://ecode360.com/8696165. The enacting legislation cites the County residency restrictions, and suggests that the Town's reasons for

---

[16] One-quarter mile is equivalent to 1,320 feet.

implementing its own restrictions are similar and that the Town's restrictions make up for perceived deficiencies in the County's restrictions:

> . . . The Town Board hereby finds and determines that sex offenders, as defined in this chapter, pose an unreasonable threat to the safety and well-being of children within the Town of Southampton because their risk of repeat offense has been determined to be either high or moderate.
>
> . . . The Town Board hereby finds and determines that there are certain areas of the town where large numbers of children learn, play, congregate and travel and these areas are particularly in need of protection from the unreasonable threat of sex offenders.
>
> . . . The Town Board further finds and determines that information is currently available to public safety agencies and the general public regarding the locations of the residences and places of employment of sex offenders, which information is available through the State of New York sex offender registry, the internet and other sources.
>
> . . . The Town Board further finds and determines that Suffolk County has already enacted restrictions preventing all registered sex offenders from residing within one quarter mile of any public or private nursery, elementary, middle or high school, licensed day-care center, or playground.
>
> . . . The Town Board further finds and determines that Suffolk County's law has certain limitations, among them, that the Suffolk County law does not provide the level of protection to the children of the Southampton Town who live in school districts that do not offer and fund transportation services for all students living within one (1) mile of their respective school that the Town Board finds necessary for the protection of those children.
>
> . . .
>
> The Town Board finds and determines that the purpose of this Chapter is not to punish sex offenders, but rather to provide a regulated system that prevents sex offenders from residing in areas where large numbers of children learn, play, congregate and travel.

(Dkt. No. 68-2 (Law of Oct. 23, 2007, Loc. L. No. 51-2007, § 1 (2007) (adopting Town Code ch. 215, art.1)).)

The Town residency restrictions apply to any *risk-level two or three* sex offenders, as long as they are subject to the State registration requirements. Town Code ch. 215, art. 1,

§§ 215-1, 215-2.  Under these restrictions, it is unlawful for such sex offenders to take up residence within (i) one mile of a school that does not transport students residing in a one-mile radius thereof; (ii) 2,000 feet of a school that does transport these students; and (iii) 2,000 feet of a "child-care facility or municipal recreational facility." *Id.* § 215-2.  Like the County, the Town exempts prior-established residences from these restrictions, including residences established before October 23, 2007.  *Id.* § 215-3.

### C. Procedural History and Claims

On November 26, 2012, the original complaint was filed in *Wallace* by Plaintiff Wallace and other unnamed plaintiffs.  (*See* Dkt. No. 1 (listing "Troy C. Wallace, et al." as the plaintiffs).)  Two days later, the same complaint was re-filed, styled as an "amended" complaint.  (Am. Compl., at 1.)  The amended complaint, which is the operative *Wallace* Complaint, was signed by all Plaintiffs (*id.* at 20), and it attached, and incorporated by reference, form complaints from each of the Plaintiffs *except* for Wallace, whose individualized allegations were set forth in the body of the amended complaint.   (Dkt. Nos. 5-1–5-8).

In the *Wallace* Complaint, Plaintiffs claim, pursuant to 42 U.S.C. § 1983 ("Section 1983"), that:

- the State registration requirements violate the *Ex Post Facto* Clause because they impose a duty to register on "those convicted of qualifying offenses before the passing of the law" and, as  amended in 2006, lengthen the duty from "ten years" to "lifetime duration" after those individuals' convictions (Am. Compl. ¶¶ 1-2, 15, 37);

- the State, County, and Town residency restrictions also amount to *ex post facto* violations, in that these restrictions impose a restraint, and sometimes "uproot[] offenders from their communities," based on a "past conviction" (*id.* ¶¶ 3, 27, 29, 37, 41); and

- the County's trailer program—which Defendant Westergaard operates and for which Defendant Alexander furnishes transportation, in their official capacities— deprives sex offenders, forced into homelessness through the above restrictions, of the same conditions that "other free men" enjoy, *e.g.*, access to "therapeutic

programming, schooling, employment and . . . regular showering," in violation of the Fourteenth Amendment's Equal Protection Clause (*id.* ¶¶ 45-46).

Plaintiffs also claim that the County and Town residency restrictions are preempted by state law in an area of regulation, *i.e.* "sex offenders," that the State intended to occupy (*id.* ¶¶ 3, 39). With respect to their Section 1983 and supplemental state law claims, Plaintiffs are seeking compensatory damages and up to $25 million in punitive damages, as well as declaratory and injunctive relief. (*E.g.*, Dkt. No. 5-1, at 5.)

On March 8, 2013 and April 2, 2013, Judge Joseph F. Bianco, who was previously assigned to this case, ordered that 13 pending cases, *see supra note* 1, and any future cases relating to the above requirements and restrictions, be consolidated with, and considered related to, *Wallace* as the lead case. (*See* Dkt. Nos. 27; 40.) Judge Bianco also directed that any submissions in these consolidated cases should be docketed in *Wallace*. (*Ibid.*)

On April 19, 2013, *Wallace* was reassigned to the Court. Shortly thereafter, the Court consolidated two subsequently-filed cases with *Wallace*, consistent with Judge Bianco's orders.

Between September 24, 2013 and October 7, 2013, Defendants filed four fully-briefed motions to dismiss the claims in *Wallace*.[17] (Dkt. Nos. 68-70; 79.)

On May 13, 2014, the Court held limited oral argument on the impact of the County and Town residency restrictions on where convicted sex offenders may live, and subsequently ordered the Town to submit information on where within its geographical boundaries convicted sex offenders are permitted to live pursuant to these restrictions. (Minute Entry, dated May 13,

---

[17]    Defendant CHI, which is not named in *Wallace*, and Defendant Roberts also filed a fully-briefed joint motion to dismiss in one of the consolidated cases (13-CV-154). (Dkt. No. 73.) The Court will address that motion in a separate decision.

2014.)  The Town submitted this information on June 24, 2014 and August 5, 2014.  (Dkt. Nos. 94-1; 96.)

## II.  Discussion

### A.  Standard of Review

Even with the "special solicitude" to which their complaints are entitled, and the assumption that any reasonably-inferred factual allegations contained therein are true, *pro se* plaintiffs must still satisfy the "plausibility standard" of pleading claims for which relief may be granted, pursuant to *Ashcroft v. Iqbal* ("*Iqbal*"), 556 U.S. 662 (2009) (Kennedy, J.), and *Bell Atl. Corp. v. Twombly* ("*Twombly*"), 550 U.S. 544 (2007) (Souter, J.).  *See Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009) (applying *Iqbal/Twombly* to its *de novo* review regarding the sufficiency of a *pro se* plaintiff's amended complaint).  Otherwise, such claims are susceptible to a motion to dismiss.

Under *Iqbal/Twombly*, a claim may only survive such a motion, if the complaint does more than recite the legal "elements" of the claim and, with respect to the claim, makes "factual allegations" which sufficiently "raise a right to relief above the speculative level." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.  To be sufficient to exceed mere speculation, such allegations must allow the Court, based on its "judicial experience and common sense," to infer that the claim is plausible, *i.e.*, to make a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678-79.  Even if the claim need not establish that the defendant is *probably* liable, the claim still has to cross the "line between *possibility* and *plausibility*." *Twombly*, 550 U.S. at 556-57 (emphasis added).

Ordinarily, "the court should not dismiss [*pro se* complaints] without granting leave to amend at least once." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).  However, where the Court scours the complaint and determines that there are no claims that *pro se* plaintiffs have

simply "inadequately or inartfully pleaded," it may deny them the "chance to reframe" their claims, because any amendment would be "futile."[18] *Id.*

### B. Article III Standing

Although the State and Epley are the only ones to contest Plaintiffs' standing (State Br., at 13-14; Epley Br., 5-8), the Court has an "independent obligation" to analyze the issue of standing, as it implicates the Court's jurisdiction to consider the relevant challenges to the registration requirements, residency restrictions, and trailer program. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (O'Connor, J.); *see also Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005) ("Because the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*."). The reason is that Article III of the Constitution only confers jurisdiction on federal courts over "Cases" and "Controversies," U.S. Const. art. III, § 2, cl. 1; and standing, at its "core," is an "essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife* ("*Defenders of Wildlife*"), 504 U.S. 555, 560 (1992) (Scalia, J.); *see also Warth v. Seldin*, 422 U.S. 490, 498 (1975) (Powell, J.) ("In its constitutional dimension, standing imports justiciability:  whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III.").

"[T]he irreducible constitutional minimum of standing contains three elements.  First, the plaintiff must have suffered an *injury in fact*—an invasion of a legally protected interest which is

---

[18]     As the dismissal of Plaintiffs' claims will make clear, there is no indication that Plaintiffs have any "claim that [they] inadequately or inartfully pleaded" in the *Wallace* Complaint, such that a *plausible* one "might be stated" with additional facts. *Cuoco*, 222 F.3d at 112 (quotations omitted).  For instance, even if Plaintiffs allege facts to overcome the standing or Eleventh Amendment immunity issues, they cannot sufficiently allege the claimed constitutional violations. *See infra* Sections II.C & II.D.

(a) *concrete and particularized*, and (b) *actual or imminent*, not 'conjectural' or 'hypothetical[.]' Second, there must be a *causal connection* between the injury and the conduct complained of— the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be *redressed by a favorable decision*." *Defenders of Wildlife*, 504 U.S. at 560-61 (emphasis added) (citations and quotations omitted; second, third, and fourth modifications in the original); *see also Allen v. Wright*, 468 U.S. 737, 751 (1984) (O'Connor, J.) (outlining the "core component" of standing), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components*, __ U.S. __, 134 S.Ct. 1377 (2014) (Scalia, J.); *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) (Rehnquist, J.) (same).

With respect to the injury-in-fact element, the injury is (i) "concrete," if it is "capable of resolution through the judicial process" and not "too abstract," *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (Rehnquist, C.J.) (quoting *Flast v. Cohen*, 392 U.S. 83, 97 (1968) (Warren, C.J.), and *Allen*, 468 U.S. at 752); and (ii) "particularized," if the plaintiff is "himself among the injured" and not simply someone who retains a "special interest" in the injury, *Defenders of Wildlife*, 504 U.S. at 561 n.1, 563 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972) (Stewart, J.)) (adding that "particularized" means that "the injury must affect the plaintiff in a personal and individual way").  Moreover, the injury, if not "actual," must otherwise be "imminent," meaning that it is "*certainly* impending" and not merely occurring at "some indefinite future time." *Defenders of Wildlife*, 504 U.S. at 564 n.2 (emphasis in original) (quoting *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990) (Rehnquist, C.J.)); *accord Clapper v. Amnesty Int'l USA* ("*Amnesty Int'l*"),

__ U.S. __, 133 S.Ct. 1138, 1150 n.5 (2013) (Alito, J.) (proposing a "'substantial risk'" standard of imminence, as an alternative to the "'clearly impending' requirement").

The burden of proving the above elements belongs to the plaintiff, and depends on the "manner and degree of evidence required at the successive stages of the litigation." *Defenders of Wildlife*, 504 U.S. at 561 (collecting cases). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" to show an injury-in-fact. *Id.* Additionally, where the plaintiff is an "object" of the "government action," whose legality is challenged, "there is ordinarily little question that the action . . . has caused [the plaintiff] injury, and that a judgment preventing . . . the action will redress it." *Id.* at 561-62.

### 1. Standing to Challenge the State Registration Requirements

First, the Court considers whether Plaintiffs have standing to challenge the original State registration requirements, as adopted in 1996, and the current ones, as amended in 2006. The immediate injury for sex offenders, as a result of these requirements, is the fact that they impose a "disability" through annual registration—which, as to some individuals, lasts their whole lives.[19] (Am. Compl. ¶¶ 20, 24 & at 18-19.) As alleged, the injury is "concrete," because a decision by the Court, should it conclude that these requirements are unconstitutional, could "capabl[y]" resolve the source of the injury, *i.e.*, sex offender registration. *Raines*, 521 U.S. at 819.

These requirements, as adopted in 1996 and/or as amended in 2006, personally apply to Plaintiffs. Contrary to the State's argument that there is insufficient information with which to draw this conclusion (State Br., at 4), the information on its sex offender registry website about

---

[19] According to Plaintiffs, these requirements also indirectly result in "financial and emotional consequences," such as the inability to find employment or threats by others in the community, based on one's status as a registered sex offender. (Am. Compl. ¶¶ 20, 24-26.)

Plaintiffs' convictions and the duration of their sentences indicates that Plaintiffs are required to register. Indeed, the appearance of Plaintiffs on the *registry* website is proof alone that they are registered pursuant to these requirements. *See* http://www.criminaljustice.ny.gov/nsor ("This directory now posts multiple photographs of *registered* sex offenders, as they become available[.]") (emphasis added). The information on this website specifically suggests that Plaintiffs Wallace and McLaurin and possibly Plaintiff Geoffrion, released prior to 2002, were subject to these requirements, as adopted in 1996; and that they *and* the remaining Plaintiffs, released after 2002, are still subject to these requirements, as amended in 2006.[20] *See supra* Section I.A. In light of the fact that these requirements apply to Plaintiffs, they are likely "among" the individuals who suffer the alleged injury that stems from these requirements. *Defenders of Wildlife*, 504 U.S. at 563. Accordingly, the injury is "particularized" as to Plaintiffs. *Id.*

That Plaintiffs must adhere to these requirements, and will invariably suffer the disability that these requirements impose on their lives, is sufficient to establish that the alleged injury actually exists. No speculation is necessary, as the "actual" nature of the injury is apparent. *Id.* at 560. Considering that the injury relating to these requirements is "actual" and "concrete and particularized," Plaintiffs have established the injury-in-fact element. *Id.* at 560-61.

There is "little question" about the remaining two elements, causation and redressability. *Id.* at 561-62. The above injury-in-fact supports a dispute over requirements that directly

---

[20] As to whether these requirements apply to Plaintiffs retroactively, this issue constitutes part of their *ex post facto* claim, and not their standing to challenge these requirements in the first place. *See Flast*, 392 U.S. at 99 ("The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and *not on the issues he wishes to have adjudicated*.") (emphasis added). The Court accordingly addresses this issue in the context of the adequacy of the claim itself. *See infra* Sections II.C.3 & II.D.2.i.

regulate Plaintiffs and other sex offenders.  As such, these requirements are arguably the cause of—and, if assessed to be unconstitutional, the basis for redressing—the injury-in-fact.  *Id.*  Indeed, the analysis for the injury-in-fact element substantiates this finding.

Therefore, the Court declines to dismiss, on the basis of standing, Plaintiffs' challenge to the State registration requirements.  Only Plaintiffs Wallace, McLaurin, and Geoffrion, however, have standing to challenge the original requirements, as adopted in 1996.  All Plaintiffs have standing to challenge the current requirements, as amended in 2006.

## 2.  Standing to Challenge the State Residency Restrictions

Second, the Court considers whether Plaintiffs have standing to challenge the State residency restrictions.  These restrictions are allegedly injurious, because they prevent sex offenders from living in specific areas[21] and possibly lead to individuals being cast out of those areas.[22]  (Am. Compl. ¶¶ 20, 29, 41 & at 19.)  Surely a limitation on where one may choose to live is no more an abstract concern than, say, a decrease in opportunities to appreciate the "aesthetic and recreational values" of a river, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.* ("*Laidlaw*"), 528 U.S. 167, 183 (2000) (Ginsburg, J.) (quoting *Sierra Club*, 405 U.S. at 735); or to "use[23] or observe an animal species," *Defenders of Wildlife*, 504 U.S. at 562.

---

[21]  As alleged, only the inability to reside in certain areas, based on the County residency restrictions, have injured Plaintiffs by previously rendering them homeless.  (*See* Am. Compl., at 20 ("forced homelessness of the plaintiffs *due to Article 1 section 428 of Suffolk County's Housing Restriction Law*") (emphasis added); Pls. Opp., at 6 ("[P]laintiffs were homeless *only by virtue of de facto legislation recognized as Article 1, Section 428 of the housing restriction law*.") (emphasis added).)  However, as discussed *infra*, the absence of actual injury does not defeat Plaintiffs' standing in this case.

[22]  Plaintiffs also allege that these restrictions incidentally result in other "social disadvantage[s]" for sex offenders, such as the inability to interact with others in the community.  (Am. Compl. ¶ 29.)

[23]  The concept of "use" included "studying" or "work[ing] with" an animal.  *Defenders of Wildlife*, 504 U.S. at 566-67.

Indeed, in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977) (Powell, J.), the Supreme Court held that a plaintiff's potential inability to pursue the "housing opportunity he desires" in another area, for which he would otherwise qualify, was not a "generalized grievance" which defeated standing. *Id.* at 264. Thus, a limitation on one's housing *opportunities* is a sufficiently "concrete" injury. *Raines*, 521 U.S. at 819.

As shown before, the information on the State's sex offender registry website supports a preliminary assessment of which Plaintiffs are, in fact, affected by the alleged injury that stems from the State residency restrictions. Only Plaintiffs Aiello, Blunt, and Factor appear to be subject to these restrictions, because they were sex offenders released on parole after September 2005 *and* convicted of an offense against a child under 18-years old or classified as a risk-level three offender. *See supra* Sections I.A & I.B.2.i. Plaintiff Wallace was released on, and completed, parole for his sex offense before these restrictions were adopted. *Id.* Plaintiffs Calloway, Colon, McLaurin, and Tirado were never on parole. *Id.* Plaintiff Geoffrion was convicted, and sentenced to probation, out-of-state, *and* his probation ended prior to the adoption of these restrictions. *Id.* Accordingly, Plaintiffs Aiello, Blunt, and Factor are the only ones whom the State residency restrictions could injure in a "particularized" way, in that they, and not the other Plaintiffs, are subject to these restrictions. *Defenders of Wildlife*, 504 U.S. at 563.

The fact that Plaintiffs Aiello, Blunt, and Factor do not claim that they attempted to reside in particular areas within the State, but were prevented from doing so by the State residency restrictions, does not deprive them of standing to challenge these restrictions. These Plaintiffs can establish standing on the basis that they definitely *would be* prevented from doing so in the future. The continued residence of these Plaintiffs within the State—in "geographical

proximity" to the areas specified by these restrictions—suffices to show their "imminent" inability to reside in certain areas, without additional proof as to their "past [residential] use" of those areas. *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147, 1149 (9th Cir. 2000) (explaining the reasoning in *Laidlaw*); *cf. Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (White, J.) ("[I]t is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.") (quotations omitted) (second and third modifications in the original).

As an example, in *Village of Arlington Heights*, one of the plaintiffs alleged an injury based on his inability to pursue the disputed "housing opportunity he desires" in a village where he worked, but had never resided. 429 U.S. at 264. The plaintiff, at the time, resided in another village "20 miles away." *Id.* Nevertheless, the Supreme Court held that the plaintiff's alleged injury supported his standing to sue. *Id.* Likewise, in *Laidlaw*, one of the plaintiff's members lived "20 miles" outside of the town in which the affected area was located, and never used the area for recreation. 528 U.S. at 182. The Supreme Court, however, held that the member faced an actionable injury from certain "challenged activity" that could impact her possible future use of the area, and, thus, that the plaintiff had associational standing. *Id.* at 182-84.

Indeed, in-state residence is a more "tangible, continuing connection to any particular location affected by the challenged decision," *i.e.*, the State residency restrictions, than mere residence "halfway around the world" from that location. *Id.* at 184 (distinguishing *Defenders of Wildlife*, which held that there was no imminent injury); *Ecological Rights Found.*, 230 F.3d at 1148. Additionally, this connection, through in-state residence, is not one that "relies on a highly attenuated chain of possibilities" contingent on third-party actions to support a finding of an

"imminent" injury-in-fact. *Amnesty Int'l*, 133 S.Ct. at 1147-50 & n.5 (holding that the plaintiffs could not show that they would suffer an injury-in-fact from the interception of their foreign communications, "at some point in the future," as their theory hinged on a "chain of contingencies" involving the possible actions of the "Government" and "Article III judges who serve on the Foreign Intelligence Surveillance Court"). Rather, because Plaintiffs Aiello, Blunt, and Factor already live in the State, they would only have to take the extra step of attempting to establish their residence elsewhere within the State, in areas from which they are barred by the State residency restrictions, to suffer the alleged injury at some later point in time.

The fact that these three Plaintiffs fail to allege that they own property—in areas restricted by the State, the County, *or* the Town (Epley Br., at 7)—does not defeat the imminence of the alleged injury that results from the various restrictions. *See Vill. of Arlington Heights*, 429 U.S. at 264 (finding that the plaintiff alleged an injury-in-fact, despite the fact that he did not own any property in the village, or in the new housing development located in the village, from which he was precluded); *see also Laidlaw*, 528 U.S. at 182 (observing that one member, whose alleged injury supported the plaintiff's associational standing, "would like to purchase," but did not own, property in the affected area). Although Plaintiffs Aiello, Blunt, and Factor have alleged no "actual" injury as a result of these restrictions, they certainly have alleged an "imminent" one. *Defenders of Wildlife*, 504 U.S. at 564 n.2. As such, these three Plaintiffs have established the injury-in-fact element, in that their alleged injury from these restrictions is "imminent" *and* "concrete and particularized." *Id.* at 560. It is also clear that the injury-in-fact is caused by, and can be redressed through a ruling on, these restrictions, which, like the State registration requirements, specifically target these three Plaintiffs and other sex offender probationers and parolees. *Id.* at 560-61.

Therefore, the Court declines to dismiss, on the basis of standing, the challenge to the State residency restrictions, specifically brought by Plaintiffs Aiello, Blunt, and Factor. All other Plaintiffs lack standing, because they have not alleged an injury-in-fact as a result of these restrictions.

### 3. Standing to Challenge the County and Town Residency Restrictions

Third, the Court considers whether Plaintiffs have standing to challenge the County and Town residency restrictions. The same alleged injury inflicted by the State residency restrictions—that is, the inability for sex offenders to reside in, and their possible displacement from, specific areas—is attributable both to the County residency restrictions and, though inartfully pleaded, to the Town residency restrictions. (Am. Compl. ¶¶ 20, 27, 29-30 & at 19; *see also id.* ¶ 44 (imputing the same allegations to the Town residency restrictions).) Additionally, the County residency restrictions, in confining the residence of sex offenders to particular areas within the County, allegedly leave such individuals without housing options and, thus, potentially homeless. (*See* Am. Compl., at 20; Pls. Opp., at 6.) There is no reason why the alleged injury from the County and Town residency restrictions is any less "concrete" than that of the State residency restrictions. *Raines*, 521 U.S. at 819 (holding that an injury is "concrete," if it is not "too abstract" and is "capable of resolution through the judicial process"). The County and Town residency restrictions also ostensibly apply to all Plaintiffs, as registered risk-level two and three sex offenders, and, thus, are capable of inflicting a "particularized" injury on Plaintiffs. *Defenders of Wildlife*, 504 U.S. at 563.

Plaintiffs, except for Plaintiff Tirado, allegedly reside or have resided in the County. *See supra* Section I.A. Mere "geographical proximity" to particular areas, affected by the County residency restrictions, is sufficient to establish "imminent" injury. *Ecological Rights Found.*, 230 F.3d at 1147, 1149. Furthermore, the fact that these Plaintiffs purportedly have been homeless

before, because of the County residency restrictions (Am. Compl., at 20; Pls. Opp., at 6), suggests that the injury is not only "imminent," but "actual." *Defenders of Wildlife*, 504 U.S. at 560.

As for the Town residency restrictions, none of the Plaintiffs appear to live in the Town; however, all but Plaintiff Tirado live or have lived in the County, where the Town is located. *See supra* Section I.A. Although Epley argues that the absence of evidence that these Plaintiffs ever previously resided or presently reside in the Town refutes the existence of any "actual or imminent" injury (Epley Br., at 6-7), the Supreme Court, in *Village of Arlington Heights* and *Laidlaw*, held the exact opposite: in those cases, it concluded that a plaintiff, who lived outside of the town or village in which the affected area was located, also alleged an injury-in-fact with respect to particular actions pertaining to that area. *See Laidlaw*, 528 U.S. at 182-84; *Vill. of Arlington Heights*, 429 U.S. at 264. Similarly, in this case, the fact that these Plaintiffs reside in the same County as the Town supports the imminence of the injury stemming from restrictions that relate to specific areas of the Town. Such proximity to the Town reassures the Court that the "legal questions" regarding these restrictions are not being addressed in a "rarified atmosphere of a debating society," but rather in a "concrete factual context" involving an appreciable threat of injury to these Plaintiffs, one that "judicial action" can resolve. *Valley Forge Christian Coll.*, 454 U.S. at 472.

Because these Plaintiffs allege that they actually have been and/or imminently will be injured, in a concrete and particularized fashion, by the County and Town residency restrictions, they have established the injury-in-fact element. *Defenders of Wildlife*, 504 U.S. at 560. For the same reasons articulated *supra* at Sections II.B.1 & II.B.2, these Plaintiffs have also established the causation and redressability elements.

Therefore, the Court declines to dismiss, on the basis of standing, the challenge to the County and Town residency restrictions by Plaintiffs. The only exception is that Plaintiff Tirado has not pleaded enough to demonstrate his injury-in-fact from these restrictions, and, thus, he does not have standing.

### 4. Standing to Challenge the County's Trailer Program

Finally, the Court considers whether Plaintiffs have standing to challenge the County's trailer program. This program purportedly leaves otherwise homeless sex offenders to tolerate living conditions, at a level below that of "other free men." (Am. Compl. ¶¶ 45-46.) The alleged injury to such individuals through this program—the inability to enjoy the same living conditions as everyone else—is "concrete" enough to support their injury-in-fact. *Raines*, 521 U.S. at 819; *cf. Ne. Fla. Ch. of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) (Thomas, J.) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.").

Plaintiffs, except for Plaintiff Tirado, are allegedly sex offenders who face or have faced the possibility of becoming homeless within Suffolk County, because of the various residency restrictions to which they are subject. *See supra* Sections II.B.2 & II.B.3. Based on this allegation, it is plausible that this program covers these Plaintiffs and, thus, that the alleged injury perpetrated by this program affects them personally. In short, the injury is sufficiently "particularized." *Defenders of Wildlife*, 504 U.S. at 563.

The above finding is borne out through other generalized allegations of these Plaintiffs' coverage by this program in the past, and their resulting treatment as "prisoners," rather than "free men," *see supra* Section I.A. At least two Plaintiffs, Wallace and Calloway, allege that

they continue to be homeless in Suffolk County, *id.*, and, thus, could be covered by this program again. In other words, the injury that allegedly arises from this program is not only personal to these Plaintiffs, but also actually occurring and/or imminently bound to occur. *Defenders of Wildlife*, 504 U.S. at 560.

Having alleged an "actual" and/or "imminent" injury that is "concrete and particularized," *id.*, these Plaintiffs have established the injury-in-fact element with respect to the County's trailer program. These Plaintiffs have also established the causation and redressability elements, because the cause of, and basis for redressing, the injury-in-fact is this program and its creation of living conditions less favorable to homeless sex offenders than those of "other free men" residing in Suffolk County. *Id.* at 561-62; (Am. Compl. ¶ 46).

Therefore, the Court declines to dismiss, on the basis of standing, Plaintiffs' challenge to the County's trailer program, with the exception of Plaintiff Tirado.

### C. The State's Motion to Dismiss

Having held that there is standing to substantiate the challenges to the registration requirements, residency restrictions, and trailer program at the pleading stage, the Court turns to the specific arguments for dismissal in Defendants' respective motions, starting with the State's motion.

#### 1. Statute of Limitations

The State argues that, pursuant to Section 1983, the *ex post facto* claims—relating to (i) the original and current State registration requirements and (ii) the State residency restrictions—started to accrue when these requirements and restrictions took effect. Thus, the claims brought against the State in 2012—*six years* after the last effective date of these requirements and restrictions—are time-barred based on the applicable three-year statute of limitations. (State Br., at 14-16.)

Indeed, the applicable statute of limitations for Section 1983 claims is the State's "general or residual statute of limitations governing personal injury actions," which is three years. *Owens v. Okure*, 488 U.S. 235, 245, 251 (1989) (Marshall, J.). The accrual of such claims, however, hinges on federal law. *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994). Under federal law, such claims ordinarily accrue, once the plaintiff "knows or has reason to know of the allegedly impermissible conduct and the resulting harm." *Veal v. Geraci*, 23 F.3d 722, 724 (2d Cir. 1994); *see also Eagleston*, 41 F.3d at 871 (same). Pursuant to the ordinary accrual rule, the claims against the State could be deemed as having started to accrue on the effective dates for these requirements and restrictions, *i.e.*, in 1996, 2005, and 2006, when Plaintiffs and other sex offenders had "reason to know" that these requirements and restrictions constituted *ex post facto* violations. *Ibid.* By this reasoning, the three-year time limit to bring any such claims expired as of 2009 at the latest, three years before this case began.

However, an exception to the ordinary accrual rule exists, one that several other Circuits have recognized and this Circuit has not expressly rejected: the clock on any challenge to the constitutionality of a statute, whose continued application works an ongoing constitutional violation, starts to run anew, every day that the statute applies. The accrual exception embraces the idea that "continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations." *Va. Hosp. Ass'n v. Baliles*, 868 F.2d 653, 663 (4th Cir. 1989) (quotations omitted) (adding that the accrual exception was "in line with appellate precedent").

In *Kuhnle Brothers, Inc. v. County of Geauga*, 103 F.3d 516 (6th Cir. 1997), the Sixth Circuit held that a Section 1983 claim, challenging a law that restricted access by trucks to a particular county road as a due process deprivation of liberty, was timely, based on Ohio's two-year statute of limitations. *Id.* at 518, 521-22. This claim was brought "more than two years

after" the enactment of the law, but "less than two years after" the law ceased to apply. *Id.* at 518. The court in *Kuhnle* concluded:

> [The law] barred [the plaintiff] from using the roads in question on an ongoing basis, and thus actively deprived [the plaintiff] of its asserted constitutional rights every day that it remained in effect. A law that works an ongoing violation of constitutional rights does not become immunized from legal challenge for all time merely because no one challenges it within two years of its enactment. . . .
>
> [The plaintiff] suffered a new deprivation of constitutional rights every day that [the law] remained in effect[.] . . . Since the last alleged deprivation occurred less than two years before [the plaintiff] filed its complaint, [the plaintiff's] action is not time-barred.

*Id.* at 522. *See also Maldonado v. Harris*, 370 F.3d 945, 955-56 (9th Cir. 2004) (holding that a First Amendment challenge to a California statute on outdoor advertising was not time-barred, because the "continuing enforcement of the statute" permitted the plaintiff "to raise a facial challenge to the statute at any time"); *Va. Hosp. Ass'n*, 868 F.2d at 663 (agreeing with the district court that, since its enactment, Virginia's "current reimbursement plan" perpetrated an "ongoing" violation of the supremacy and due process clauses, and, thus, the applicable limitations period "would not have begun to run until the violation ended"); *Bonollo Rubbish Removal, Inc. v. Town of Franklin*, 886 F. Supp. 955, 958-60 (D. Mass. 1995) (finding, with respect to the constitutional and antitrust claims challenging a town by-law on waste delivery, that the "usual rule [for accrual] is preempted," based on the fact that "the plaintiff's injury here (the higher fees) continued for as long as the practice or policy complained of (the by-law) was in existence").

The Court adopts the accrual exception recognized in the above-cited cases. Even under this more expansive approach, however, some of Plaintiffs' claims regarding the State's sex offender regime must be dismissed. The original State registration requirements became effective in 1996 and stayed in effect until their amendment in 2002. *See supra* Section I.B.1.

Accordingly, any claim challenging these requirements began to accrue no later than 2002, and should have been brought within three years, not ten years, thereof.

The accrual exception, however, salvages Plaintiffs' claims challenging the State's *current* sex offender regime. Although the current State registration requirements and residency restrictions took effect more than three years before this case was filed, they remain in effect today. *See supra* Sections I.B.1 & I.B.2.i. These claims are continually accruing, and, thus, their statute of limitations has not begun to run.

Therefore, based on the accrual exception, the Court declines to dismiss, as time-barred, the *ex post facto* claims challenging the current State registration requirements and residency restrictions, but dismisses the claim challenging the original State registration requirements.

### 2. Eleventh Amendment Immunity

The State also argues that the Eleventh Amendment immunizes it from the *ex post facto* claims for "monetary, injunctive *and* declaratory relief." (State Br., at 12-13 (emphasis added).)[24] This is correct as to the State, but not as to State officials sued in their official capacities over claims for prospective non-monetary relief.

Eleventh Amendment immunity ultimately shields the State from any federal lawsuit against it "in its own name regardless of the relief sought," unless "[it] has waived its Eleventh Amendment immunity or Congress has overridden it." *Graham*, 473 U.S. at 167 n.14; *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-99 (1984) (Powell, J.) (same); *Quern v. Jordan*, 440 U.S. 332, 340-41 (1979) (Rehnquist, J.) (same). It is axiomatic that the

---

[24] Although not raised by the State, the Court notes that another argument supporting the dismissal of Plaintiffs' Section 1983 claims against the State is that "a State is not a 'person' within the meaning of § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65-66 (1989) (White, J.) (stating that this argument and the Eleventh Amendment argument are "separate issues" that relate to a plaintiff's Section 1983 claim).

State has not agreed to waive, nor has Congress intended to override, the State's immunity from being sued in federal court based on Section 1983. *See Quern*, 440 U.S. at 341 ("[W]e simply are unwilling to believe . . . that Congress intended by the general language of § 1983 to override the traditional sovereign immunity of the States."); *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 39 (2d Cir. 1977) (holding, in a Section 1983 action, that New York has not waived its Eleventh Amendment immunity, but that it only "consents to be sued upon condition that the claimant brings suit in the [New York] Court of Claims"); (*see also* State Br., at 12-13 (same)).

Ordinarily, the same immunity extends to State officials sued in their official capacities. *See Pennhurst*, 465 U.S. at 101-102 ("[A]s when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief."); *accord Edelman v. Jordan*, 415 U.S. 651, 663 (1974) (Rehnquist, J.) (holding that, "even though a State is not named a party to the action, the suit may nonetheless be barred by the Eleventh Amendment"). The exception, however, is that State officials are not immune from official-capacity claims seeking *prospective* injunctive or declaratory relief. *See Graham*, 473 U.S. at 167 n.14 & 169 n.18 (noting that a plaintiff can avoid the Eleventh Amendment immunity issue, in challenging any "state policy or custom," by "naming state officials" in their official capacities through an "injunctive or declaratory" action "for prospective relief"); *see also Quern*, 440 U.S. at 337 (accepting the "difference between prospective relief on one hand and retrospective relief on the other" as the basis for determining what is permitted or barred by the Eleventh Amendment in an official-capacity action); *Edelman*, 415 U.S. at 664 (holding, in an official-capacity action claiming that Illinois's regulations violated federal law, that the Eleventh Amendment "did not bar" the "prospective portion of [the

district court's] order," but that the "retroactive" portion "stands on quite a different footing"); *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) ("A plaintiff may avoid the Eleventh Amendment bar to suit and proceed against individual state officers, as opposed to the state, in their official capacities, provided that his complaint (a) 'alleges an ongoing violation of federal law' and (b) 'seeks relief properly characterized as prospective.'") (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (Scalia, J.)); *but see Pennhurst*, 465 U.S. at 106 (holding that the exception is "inapplicable in a [federal] suit against state officials on the basis of state law"). In theory, the exception is sustained by the Supreme Court's longstanding "fiction" in *Ex parte Young*, 209 U.S. 123 (1908), that, for purposes of Eleventh Amendment immunity, forward-looking, and not retrospective, official-capacity claims seeking non-monetary relief are "not one[s] against the State," but the State officials themselves. *Pennhurst*, 465 U.S. at 102-103, 105; *see Graham*, 473 U.S. at 167 n.14 (citing *Ex parte Young* for the proposition that "official-capacity actions for prospective relief are not treated as actions against the State").

Here, the State has Eleventh Amendment immunity from the *ex post facto* claims against it, which are dismissed in their entirety. However, given the official-capacity exception to Eleventh Amendment immunity, Plaintiffs could simply amend the *Wallace* Complaint to name specific officials of the State, against whom those claims, insofar as they seek prospective injunctive or declaratory relief, can be asserted without the shield of immunity. Logically, such officials would be individuals who have implemented the State statutes that supposedly violate the Constitution, *i.e.*, its registration requirements and residency restrictions. *See CSX Transp., Inc. v. N.Y. Office of Real Prop. Servs.*, 306 F.3d 87, 98 (2d Cir. 2002) (noting that the *Ex parte Young* exception to Eleventh Amendment immunity is "limited" to "a state official's *actions in enforcing state law*") (emphasis added) (quotations omitted). Put simply, even if Plaintiffs

cannot challenge the State's sex offender regime by asserting claims against the State itself, they can bring the same challenge by asserting claims against State officials who enforce the regime.

Therefore, the Court dismisses Plaintiffs' *ex post facto* claims against the State based on its Eleventh Amendment immunity. Because these claims could have been brought against State officials who enforce the State's sex offender regime, and the *Wallace* Complaint could be so amended, the Court proceeds to consider the State's other asserted grounds for dismissal.

### 3. Failure to State a Claim

The State argues that Plaintiffs fail to plausibly allege that the current State registration requirements[25] and residency restrictions contravene the *Ex Post Facto* Clause of the Constitution. (State Br., at 17-18.)

The *Ex Post Facto* Clause prohibits any "penal statute[]" that applies "retroactively," *i.e.*, that either (i) "makes an action done before the passing of the law, and which was innocent when done, criminal[,] and punishes such action"; (ii) "aggravates a crime, or makes it greater than it was, when committed"; (iii) "changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed"; or (iv) "alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offence, in order to convict the offender." *Collins v. Youngblood*, 497 U.S. 37, 40-42 (1990) (Rehnquist, C.J.) (emphasis and quotations omitted); *see also Weaver v. Graham*, 450 U.S. 24,

---

[25]     The Court construes the State's res judicata and collateral estoppel arguments, premised on its allegation that Plaintiffs' *ex post facto* claim and related issues were already litigated "within the *Doe v. Pataki* cases" (State Br., at 16-17), as an argument that *Pataki* precludes the ability of Plaintiffs to plausibly state a claim regarding the current State registration requirements. While the res judicata and collateral estoppel arguments could have applied to the already-dismissed claim about the *original* requirements, *Pataki* did not involve identical claims or issues with respect to the *current* requirements. *See Doe v. Pataki*, 481 F.3d 69, 70 (2d Cir. 2007) (clarifying that "subsequent legislative changes," *e.g.*, amendments to the requirements in 2006, were "distinct from the subject matter of the litigation" in *Pataki*).

29 (1981) (Marshall, J.) ("[T]wo critical elements must be present for a criminal or penal law to be *ex post facto*: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it."). The *Ex Post Facto* Clause protects against "[l]egislatures . . . retroactively alter[ing] the definition of crimes or increas[ing] the punishment for criminal acts." *Collins*, 497 U.S. at 43. Here, Plaintiffs allege that the State's enactment of the current registration requirements and residency restrictions—*after* Plaintiffs committed, and were convicted of, their respective sex offenses—amounts to a retroactive increase in their punishment in violation of the *Ex Post Facto* Clause. This is incorrect.

In the context of "restrictive measures on sex offenders," the Supreme Court, in *Smith v. Doe*, 538 U.S. 84 (2003) (Kennedy, J.), set forth the following "framework" for considering whether a statute is punitive in nature, such that its retroactive application triggers the *Ex Post Facto* Clause. *Id.* at 92-93. First, the Court must evaluate whether the "intention of the legislature" was to enact a statute that is "civil and nonpunitive." *Id.* at 92. If so, the Court must then consider "whether the statutory scheme is so punitive either in purpose or effect as to negate" the legislative intent. *Id.* (quotations omitted). Because courts "ordinarily defer to the legislature's stated intent, only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* (citations and quotations omitted). In determining whether the challenged statutory scheme is punitive in effect, the Court should consider "whether, in its necessary operation, the [statutory] scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Id.* at 92, 97 (setting forth several factors as "useful guideposts," which are "neither exhaustive nor dispositive") (quotations omitted). The

challenging party's inability to establish, by the "clearest proof," the punitive effect of the statutory scheme provides a basis for dismissing an *ex post facto* claim. *Id.* at 92, 105-06.

> i. *Ex Post Facto* Claim Relating to the Current State Registration Requirements

> a. *Retroactivity*

Because the retroactive application of the current, *i.e.*, post-January 2006, State registration requirements is a necessary predicate to the *ex post facto* claim, the Court begins by ascertaining whether these requirements apply retroactively to Plaintiffs. Based on the information discussed *supra* at Sections I.A & I.B.1, it appears that these requirements retroactively impose a longer, lifetime duty on Plaintiffs Wallace, Tirado, and McLaurin, and deny the right to petition for relief to Plaintiffs Blunt, Calloway, Colon, Geoffrion, and McLaurin. The only Plaintiffs to whom these requirements do not apply retroactively are Plaintiffs Aiello and Factor, who committed their offenses one to two years *after* these requirements took effect in 2006. *See supra* Sections I.A & I.B.1.

> b. *Non-Punitive Intent of the State Registration Requirements*

In assessing whether a sex offender's duty to register for life without the possibility of relief amounts to a punishment for his prior conviction, the Court regards *Smith* as controlling precedent. The sex offender registration requirements challenged in *Smith*, which the Supreme Court ruled did not violate the spirit of the *Ex Post Facto* Clause, were materially similar to the State registration requirements in this case. 538 U.S. at 92-93, 105-106. In *Smith*, the plaintiffs challenged an Alaskan statute that required "serious" sex offenders to register for life without the right to relief. *See id.* at 90 (noting that an individual "convicted of an aggravated sex offense or of two or more sex offenses" was required to "register for life"); *id.* at 117 (Ginsburg, J., dissenting) ("Offenders cannot shorten their registration or notification period, even on the

clearest demonstration of rehabilitation or conclusive proof of physical incapacitation."); Brief for Respondents at 7, *Smith*, 538 U.S. 84 (2003) (No. 01-729), 2002 WL 1885873, at *7 ("The [Alaska Sex Offender Registration Act] contains no procedures through which one may escape its requirements[.]").

Since *Smith*, countless federal courts, including this one, have rejected similar *ex post facto* challenges to sex offender registration requirements. *See*, *e.g.*, *Anderson v. Holder*, 647 F.3d 1165, 1168-69 (D.C. Cir. 2011) (holding that, "like the sex offender registration requirement in *Smith*," the District of Columbia's requirement, premised on the plaintiff's conviction for a "*lifetime registration* offense," did not violate the *Ex Post Facto* Clause, and citing cases to support the conclusion that "the overwhelming weight of authority treats such laws as civil and nonpunitive") (emphasis added); *see also, e.g.*, *Am. Civil Liberties Union v. Masto* ("*Masto*"), 670 F.3d 1046, 1053 & n.4 (9th Cir. 2012) ("Because Nevada's version of SORNA does not contain any registration provision that materially distinguishes it from *Smith*, we join [our sister circuits] in concluding that the requirements of [the statute] do not constitute retroactive punishment[.]") (collecting cases); *U.S. v. Leach*, 639 F.3d 769, 773 (7th Cir. 2011) (concluding that "whether a comprehensive registration regime targeting only sex offenders is penal . . . is not an open question" after *Smith*, from which "we too are unable to find any meaningful distinctions" for purposes of challenges to the federal SORNA, and, thus, "join[ing] our sister circuits in concluding that SORNA is not an *ex post facto* law") (collecting cases); *Doe v. Bredesen* ("*Bredesen*"), 507 F.3d 998, 1000-1001, 1003-1007 (6th Cir. 2008) (applying *Smith*'s framework in affirming the constitutionality of Tennessee's requirement that the plaintiff register "for the rest of his life," without the right to "petition the circuit court," and indicating that "our sister circuits have likewise consistently and repeatedly rejected ex post facto

challenges to state statutes that retroactively require sex offenders convicted before their effective date to comply with similar registration . . . requirements") (collecting cases), *cert. denied*, 555 U.S. 921 (2008); *Spiteri v. Russo*, No. 12-CV-2780, 2013 WL 4806960, at *11, 37 (E.D.N.Y. Sept. 7, 2013) (citing *Smith* and other cases with approval, and ruling that New York's "lifetime registration requirement" does not violate the *Ex Post Facto* Clause; *Valentine v. Strickland*, No 08-CV-993, 2009 WL 9052193, at *1, 5 (N.D. Ohio Aug. 19, 2009) (upholding Ohio's requirement of "registration every ninety days for the rest of [the plaintiff's] life," in view of *Smith* and the "numerous circuit courts" who have "repeatedly rejected *ex post facto* challenges" to such requirements).[26]

Although the Second Circuit has not opined on the State registration requirements, as applied to risk-level two and three sex offenders,[27] since upholding the original requirements in *Pataki*, its decision in that case compels the same conclusion as to the current requirements. *See Spiteri*, 2013 WL 4806960, at *37 (stating, in considering the current requirements, that "[t]he Second Circuit [in *Pataki*] has made clear that registration . . . requirements under SORA do not implicate the *Ex Post Facto* Clause"); *Nolan v. Cuomo*, No. 11-CV-5827, 2013 WL 168674, at *2 & n.5 (E.D.N.Y. Jan. 16, 2013) (noting that, although the plaintiff "has not raised an *ex post facto* challenge to the increased duration of the registration periods" in the current requirements, "[a]ny such challenge would likely be foreclosed by the Second Circuit's decision [in *Pataki*]").

---

[26]     Indeed, the New York Court of Appeals has concluded that these requirements, along with the risk-level classifications on which they rely, are "nonpenal consequences that result from the fact of conviction for certain crimes." *People v. Gravino*, 14 N.Y.3d 546, 556-57 (2010); *see Allen v. Attorney Gen.*, 80 F.3d 569, 575 n.6 (1st Cir. 1996) ("[A] federal court should hesitate before disavowing a state supreme court's exposition of the purposes animating a state statute.").

[27]     The Second Circuit, however, recently rejected an *ex post facto* challenge to the State registration requirements, as applied to *risk-level one* sex offenders. *See Doe v. Cuomo*, 755 F.3d 105, 112 (2d Cir. 2014).

The *Pataki* Court providently performed a "two part inquiry," like the one that the Supreme Court would later conduct in *Smith*, and affirmed the portion of then-district court Judge Denny Chin's "thoughtful decision," which concluded that originally requiring risk-level three sex offenders and other "sexually violent predators" to register "for a minimum of ten years and potentially for life" did not constitute punishment. *Pataki*, 120 F.3d at 1271, 1284-85.

While the Court could find, based on the abundance of clear and consistent precedent, that the current State registration requirements do not violate the *Ex Post Facto* Clause, the Court nonetheless conducts its own analysis of these requirements, using the framework established in *Smith* and applying the Second Circuit's reasoning in *Pataki*.

First, the legislative intent behind the current State registration requirements is non-punitive. In 2006, the current requirements replaced the old ones as part of SORA, an act whose original aims in codifying these requirements were public protection and the improvement of law enforcement with respect to the "dangers posed by convicted sex offenders" after their release. *Id.* at 1285. Like the preamble to the original SORA legislation, the preamble to the legislation enacting the current requirements also indicated that these requirements are intended to "enhance public safety and provide better tracking and monitoring of sex offenders." 2006 N.Y. Sess. Laws Ch. 1 (S. 6409, A. 9472), § 1. The expression of such non-punitive objectives "in the statutory text itself" suffices to establish that the legislature, in enacting these requirements, did not intend for them to punish sex offenders. *Smith*, 538 U.S. at 93; *see also Pataki*, 120 F.3d at 1285 (basing its conclusion about legislative intent behind the original registration requirements primarily on "the Act's preamble"). The fact that the first objective—protecting the public—is another possible reason that sex offenders are "sentenced to correctional institutions" (Pls. Opp., at 13) does not render "the State's pursuit of it in a regulatory scheme" punitive. *Smith*, 538 U.S.

at 94.  If anything, it is the opposite:  public protection is an inherently regulatory purpose that often accompanies, and remains ancillary to, punishment in the pursuit of criminal justice.

Because the non-punitive legislative intent is borne out so expressly by the text of the enacting legislation for these requirements, the fact that the legislative history, or at least some of it, reflected oral "comments of some legislators" that evinced hostility toward sex offenders is not enough to implicitly contradict such intent.  *Pataki*, 120 F.3d at 1277.  Even if individual legislators, while debating over the enactment, allegedly described sex offenders as "depraved" or "the human equivalent of toxic waste" and swore "to get them" (Pls. Opp., at 20), these "isolated statements," though offensive and inappropriate, do not evidence the legislature's retributive intent in requiring sex offenders to register themselves for a longer and more definite length of time.  *Pataki*, 120 F.3d at 1277.  At best, these statements suggest the "subjective intent expressed by one or more legislators," and not the "objective intent of the legislature."  *Id.* (quotations omitted).

Nor do other "formal attributes" to the enactment negate the finding of non-punitive legislative intent.  *Smith*, 538 U.S. at 94.  For instance, although the legislature also enacted "criminal" penalties to ensure compliance with these requirements (Am. Compl. ¶ 13), the penalties are not contrary to its intent to legislate a regulatory scheme that protects against, not punishes, convicted sex offenders after their release.  *See Smith*, 538 U.S. at 96 ("Invoking the criminal process in aid of a statutory regime does not render the statutory scheme itself punitive.").  If anything, the penalties, as enacted, attach to a sex offender's failure to follow the regulatory scheme and not the offense for which he was first convicted.  *See id.* at 102 (holding that a "criminal prosecution" for failing to register is a "proceeding separate from the individual's original offense").

*c. Non-Punitive Effect of the State Registration Requirements*

No secondary factors suffice to counteract the non-punitive intent and purpose behind these requirements by clearly proving that they are punitive *in effect*. *Id.* at 92, 97 (holding that a court must examine whether a regulatory scheme "is so punitive either in purpose or *effect* as to negate [the State's] intention to deem it civil," and citing several factors to analyze whether the challenged restrictions have a punitive "effect") (emphasis added) (quotations omitted). First, these requirements hardly resemble the historical "shaming punishments," such as humiliation, branding, or banishment. *See id.* at 97-99 (comparing Alaska's registration requirements to the "shaming punishments of the colonial period"). Importantly, the discrete act of requiring sex offenders to register does not involve the real-time "public display *for ridicule and shaming*" that defined these historical punishments. *Id.* at 98 (emphasis added); *see also Pataki*, 120 F.3d at 1283-84 (noting that "traditional 'stigmatization' penalties" involved "the offender's physical participation in his own degradation"). A sex offender does not suffer "shaming," *as* he registers and thereby "display[s]" his conviction. *Smith*, 538 U.S. at 98. To the extent that a sex offender endures the stigma of his registered conviction (Am. Compl. ¶¶ 20, 26), it is the incidental result of the public's access, and its response, to the fact of the conviction *after* he has already registered.[28] *See Smith*, 538 U.S. at 99 ("In contrast to the colonial shaming punishments,

---

[28] Although the *Wallace* Complaint only raises an *ex post facto* claim relating to the registration requirements, Plaintiffs, at the end of their opposition brief, appear to add a claim relating to the notification provisions associated with these requirements. (*See* Pls. Opp., at 21-22.) Insofar as Plaintiffs are now pursuing such a claim, the Court adopts the reasoning in *Smith* and *Pataki*, concluding that the public notification of a sex offender's registration is not punishment. *See Smith*, 538 U.S. at 98 ("Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment."); *Pataki*, 120 F.3d at 1276-84 ("[T]he notification requirements of the SORA do not constitute punishment for purposes of the Ex Post Facto Clause.").

however, the State does not make the publicity and the resulting stigma an integral part of the objective of the regulatory scheme.").

Second, these requirements do not result in any "affirmative" restraint for purposes of punishment, in that they neither (i) impose the "paradigm[]"of imprisonment on sex offenders nor (ii) render sex offenders unable to "change jobs or residences." *Smith*, 538 U.S. at 100; *see also Pataki*, 120 F.3d at 1285 (listing "far heavier burdens . . . including deportation, termination of financial support, and loss of livelihood" that do not fit into the framework of punishment). At best, the burden of providing "periodic updates," by means of registration, is a "minor and indirect" restraint and not one that amounts to punishment. *Smith*, 538 U.S. at 100-101. Other alleged restraints, such as the inability to secure employment or housing (Am. Compl. ¶¶ 20, 24), are not otherwise attributable to these requirements. *Smith*, 538 U.S. at 101.

Third, the fact that these requirements happen to prevent future sex offenses—and, thus, serve the same deterrent function as criminal punishment—is inadequate to prove that these requirements constitute punishment. "Any number of governmental programs might deter crime without imposing punishment." *Smith*, 538 U.S. at 102; *see also Pataki*, 120 F.3d at 1285 (holding that the State's original registration requirements deter against the "dangers posed by convicted sex offenders," without serving the "goals of criminal punishments"). On the contrary, the deterrent function of these requirements is entirely consistent with the regulatory aim of protecting the public from convicted sex offenders prone to re-offending.

Nor does the basis of these requirements on risk-level classifications that take into account a sex offender's conviction mean that these requirements turn on the "extent of [the offender's] wrongdoing" and, thus, like other punishments, seek retribution. *Smith*, 538 U.S. at 102 (quotations omitted). On the contrary, the conviction itself is only one of the factors

considered in classifying a sex offender at a specific risk-level. N.Y. Correct. Law § 168-l (citing "criminal history factors" as relevant to a risk-level classification). The other factors include a sex offender's "response to treatment," "physical conditions," and "recent behavior." *Id.* In weighing other factors besides the offense for which a sex offender was convicted, a risk-level classification is actually a measure of "the risk of a repeat offense by such sex offender and the threat posed to the public safety," and not a measure of his liability for wrongdoing. *Id.*; *cf. People v. Windham*, 10 N.Y.3d 801, 802 (2008) ("[A] SORA risk-level determination is not part of a defendant's sentence. Rather, it is a collateral consequence of a conviction for a sex offense designed not to punish, but rather to protect the public[.]") (citations omitted). A sex offender's duty to register depending on his risk-level classification, therefore, is not retribution for what he did; rather, it is a regulatory duty tailored to the "extent of the risk" that he poses after his release. *Smith*, 538 U.S. at 102 (quotations omitted).

Finally, the State registration requirements are related and proportional, *i.e.*, not excessive, in relation to their two non-punitive purposes. It is accepted that having sex offenders identify themselves through registration reasonably relates to the State's interests in improving the ability of law enforcement to protect the public, where a "high rate of recidivism among convicted sex offenders" poses a real concern. *Id.* at 103. As amended, these requirements appear to assume that such ends are served by extending a lifetime duty of registration to risk-level two and three sex offenders, largely without relief. Nonetheless, the proportionality of these requirements is not defeated by the claim that they do not make the "best choice possible" to promote those non-punitive purposes. *Smith*, 538 U.S. at 105. The State's "categorical judgments"—for instance, that all risk-level three sex offenders should be required to register for life without relief, because they pose a perpetual risk to public safety based on their high

likelihood of re-offending—are a "reasonable" fit for the ends they are intended to meet, even though these judgments might not be the "best." *Id.* at 103, 105. Indeed, the State reasonably instituted a continuing system of registration, which "subject[s] persons with a greater risk of re-offense to more onerous registration requirements" without relief, based on its conclusion that such a system will promote its regulatory aims. *Pataki*, 120 F.3d at 1285.

In light of the relevant analytical framework and reasoning set forth in *Smith* and *Pataki*, Plaintiffs cannot plausibly allege any facts to establish the "clearest proof" needed to overcome the State legislature's non-punitive intent in enacting the current State registration requirements, or to "transform what has been denominated a civil remedy into a criminal penalty." *Smith,* 538 U.S. at 92 (quotations omitted). Accordingly, the Court dismisses with prejudice Plaintiffs' *ex post facto* claim relating to the State registration requirements.

### ii. *Ex Post Facto* Claim Relating to the State Residency Restrictions

#### a. *Retroactivity*

As before, the threshold issue is retroactivity. Among those with standing to bring the challenge to the State residency restrictions, only Plaintiff Blunt is subject to these restrictions retroactively: the commission of his offense occurred before these restrictions were introduced in 2005. *See supra* Sections I.A & I.B.2.i. Plaintiffs Aiello and Factor, on the other hand, committed their offenses afterward. *Id.*

#### b. *Non-Punitive Intent of the State Residency Restrictions*

Because Plaintiff Blunt's claim survives on the issue of retroactivity, the Court now considers whether his claim establishes that these restrictions equate to punishment. Although the Supreme Court in *Smith* did not assess whether sex offender residency restrictions were non-punitive in nature, its framework for evaluating *ex post facto* claims is equally instructive here. Nearly all federal courts to confront these claims have applied the framework from *Smith* and

held that such restrictions are, in fact, constitutional.[29] *See*, *e.g.*, *Doe v. Miller* ("*Miller*"), 405 F.3d 700, 704-705, 718-23 (8th Cir. 2005) (concluding, based on the "framework outlined in [*Smith*]," that Iowa's ban on sex offenders convicted of certain offenses "involving minors" from residing within 2,000 feet of a school or childcare facility "does not amount to unconstitutional *ex post facto* punishment"), *cert. denied*, 546 U.S. 1034 (2005).[30]

---

[29] Several courts were presented with, but declined to address, these claims. *See King v. McCraw*, 559 F. App'x 278, 281 (5th Cir. Mar. 10, 2014) (deeming "abandoned" the issue of whether "the district court erred in ruling that the [*ex post facto*] challenge to [the City of La Porte's sex offender residency restrictions] was not properly before it"); *Masto*, 670 F.3d at 1050, 1062-66 (concluding that its consideration of whether Nevada's "residency and movement restrictions on certain sex offenders" violated, *inter alia*, the *Ex Post Facto* Clause was "mooted"); *Poe v. Snyder*, 834 F. Supp. 2d 721, 724, 727, 732 (W.D. Mich. 2011) (addressing the application of the "residency restrictions of Michigan's Sex Offender Registration Act" to overnight shelters as a "statutory interpretation claim," and, thus, avoiding the "as-applied constitutional challenges," including an *ex post facto* claim).

[30] *See also Weems v. Little Rock Police Dep't*, 453 F.3d 1010, 1013-14, 1017 (8th Cir. 2006) (upholding Arkansas's 2,000-foot residency restriction for registered sex offenders receiving two of the highest risk-level classifications), *cert. denied*, 550 U.S. 917 (2007); *Does v. Snyder* ("*Snyder*"), 932 F. Supp. 2d 803, 807, 809-14 (E.D. Mich. 2013) (upholding Michigan's "SORA, as amended in 2011" to, *inter alia*, "alter[]" the restriction on "registrants . . . working, residing, or loitering within 1,000 feet of a school" by imposing a longer "lifetime" registration requirement on "Tier III" offenders); *Seals v. Ala.*, No. 08-CV-389, 2011 WL 2462583, at *5, 20 (M.D. Ala. May 26, 2011) (upholding Alabama's 2,000-foot "set-back restrictions on residences and places of employment" for any "adult criminal sex offender," which are "unlimited in duration"), *report-recommendation adopted by*, 2011 WL 2462572 (M.D. Ala. June 21, 2011); *Valentine*, 2009 WL 9052193, at *1, 3-5 (upholding Ohio's statutory scheme which "expanded" its residency restrictions of 1,000 feet for registered sex offenders, including "Tier III" offenders, like the plaintiff, who were required to register for life); *Gautier v. Jones*, No. 08-CV-445, 2009 WL 1444533, at *4-10 (W.D. Okla. May, 20, 2009) (upholding Oklahoma's regulations containing a 2,000-foot residency restriction for any "registered sex offender" and lifetime registration requirement for a "level III sex offender"), *rev'd on other grounds*, 364 F. App'x 422 (10th Cir. 2010); *Bulles v. Hershman*, No. 07-CV-2889, 2009 WL 435337, at *4-6 (E.D. Pa. Feb. 19, 2009) (upholding ordinance by Allentown, Pennsylvania, "preventing sex offenders who failed to register as such from residing near places where children congregate"); *Doe v. Baker* ("*Baker*"), No. 05-CV-2265, 2006 WL 905368, at *1, 3-6 (N.D. Ga. Apr. 5, 2006) (upholding Georgia's 1,000-foot residency restriction on sex offenders "required to register"); *accord King v. McCraw*, No. 10-CV-321, 2013 WL 164053, at *6-9 (S.D. Tex. Jan. 15, 2013) (denying, as futile, a proposed *ex post facto* claim challenging an ordinance by the City of La Porte, Texas, which barred a registered sex offender convicted of an offense against a victim "less than 17

One of the district courts in this Circuit addressed the *ex post facto* issue more generally, with respect to the State's "sex offender conditions," which ostensibly included its residency restrictions.[31] *Maldonado v. Fischer* ("*Fischer*"), No. 11-CV-1091, 2012 WL 4461647, at *2 (W.D.N.Y. Sept. 24, 2012); *see* Complaint, Exs. A-C, *Fischer*, No. 11-CV-1091 (W.D.N.Y. Dec. 28, 2011), ECF No. 1. The district court concluded that "to the extent that [a child sex offender] is challenging any conditions of parole which were attributable to his having been determined to

_____

years of age" from residing "within 1,000 feet of any premises where children commonly gather") (quotations omitted), *aff'd on other grounds*, 559 F. App'x 278 (5th Cir. Mar. 10, 2014); *McAteer v. Riley*, No. 07-CV-692, 2008 WL 898932, at *1, 3-5 (M.D. Ala. Mar. 31, 2008) (refusing to find a likelihood of success on the merits for the *ex post facto* claim relating to Alabama's restrictions against any "adult criminal sex offender" living or working within 2,000 feet of a school or childcare facility); *Doe v. Petro*, No. 05-CV-125, 2005 WL 1038846, at *1-2 (S.D. Ohio Oct. 24, 2006) (finding, for purposes of a temporary restraining order, that Ohio's 1,000-foot residency restriction for any registered sex offender "likely does not violate the Ex Post Facto Clause because it is not punitive in nature"); *Coston v. Petro*, 398 F. Supp. 2d 878, 884-87 & n.1 (S.D. Ohio 2005) (anticipating "a likely Ex Post Facto analysis" by holding that the plaintiffs could not establish that the same residency restriction in Ohio constituted a "criminal statute," such that they had standing to bring a facial challenge to the restriction); *cf. Cunningham v. Parkersburg Hous. Auth.*, No. 05-CV-940, 2007 WL 712392, at *8-12 (S.D. W. Va. Mar. 6, 2007) (Goodwin, J., adopting Findings-Recommendation of Stanley, Mag. J.) (upholding, under the *Ex Post Facto* Clause, a federal "residency restriction" that prohibited "lifetime registered sex offenders" from receiving public housing assistance as "most analogous" to Iowa's residency restriction in *Miller*); *Graham v. Henry*, No. 06-CV-381, 2006 WL 2645130, at *1, 3-5 (N.D. Okla. Sept. 14, 2006) (holding that the same analysis for the *ex post facto* claim in *Miller* "mak[es] it unlikely that Plaintiff will succeed" in proving his claim that Oklahoma's 2,000-foot residency restriction for registered sex offenders is a second "*criminal* punishment[]" in violation of the Double Jeopardy Clause) (emphasis in the original); *but see Mikaloff v. Walsh*, No. 06-CV-96, 2007 WL 2572268, at *3-13 (N.D. Ohio Sept. 4, 2007) (disagreeing with the chief judge's decision in *Doe v. Petro*; and concluding that a revised version of Ohio's 1,000-foot residency restriction, applying to *all* sex offenders, violated the *Ex Post Facto* Clause). Notably, several of these courts rendered decisions on this issue at the motion to dismiss stage. *See, e.g.*, *Weems*, 453 F.3d at 1012; *Snyder*, 932 F. Supp. 2d at 807; *Baker*, 2006 WL 905368, at *1. In the lone dissenting case, *Mikaloff*, the court subsequently acknowledged that the case was "one [of] the first federal cases holding that sex-offender residency restrictions can violate the ex post facto clause of the Constitution." 2009 WL 901860, at *5 (N.D. Ohio Mar. 30, 2009).

[31]  To date, the Second Circuit has *not* directly addressed an *ex post facto* claim regarding the State residency restrictions.

be subject to SORA, his allegations fail to state a claim that the imposition of the conditions violated the Ex Post Facto Clause." *Fischer*, 2012 WL 4461647, at *3.

At the state level, only a single lower-level trial court in New York has concluded that these restrictions do not comport with the *Ex Post Facto* Clause, in part, due to the alleged punitive intent with which they were enacted. *See Berlin v. Evans*, 923 N.Y.S.2d 828, 834-36 (Sup. Ct. N.Y. Cnty. Apr. 11, 2011) (holding that the State residency restrictions violate the *Ex Post Facto* Clause) (cited by Am. Compl. ¶ 41).[32] In any event, while the Court should consider statutory interpretations of state law by the State's highest courts, the Court has an independent obligation to "make [its] own constitutional assessments." *Allen*, 80 F.3d at 575 n.6.

In determining whether the State residency restrictions are punitive, for purposes of the *Ex Post Facto* Clause, the Court is guided by *Smith* and the myriad of federal courts that have extended *Smith*'s framework to sex offender residency restrictions around the country.

The Court finds that the State legislature's purpose in implementing the residency restrictions was to protect the public, specifically children, from convicted sex offenders immediately after their release, and not to punish the offenders. Although the 2005 legislation

---

[32]    Neither the New York Court of Appeals, nor the Appellate Division, has ruled on an *ex post facto* challenge to the State residency restrictions. The decision in *Berlin* was never reviewed by either court, because the appeal was abandoned after the plaintiff passed away. *See Berlin v. Evans*, 958 N.Y.S.2d 594, 595 (1st Dep't 2013). In addition, more recently, another lower-level trial court disagreed with the *Berlin* decision. *See Williams*, 979 N.Y.S.2d at 499, 503 (challenging the reasoning in *Berlin*, and concluding that "the Executive Law § 259-c(14), as amended by the 2005 Act, is not so punitive in its effect as to negate the Legislature's intent, and its retroactive application does not violate the Ex Post Facto Clause"). Like *Berlin*, *Williams* involved a non-risk-level three sex offender parolee who was convicted of an offense against a child and, thus, was subject to the State residency restrictions. *Id*. at 494-95.

enacting the State residency restrictions did not "expressly" state such a purpose,[33] this purpose was "implied[]" by the legislative history that accompanied the legislation. *Smith*, 538 U.S. at 93; *see also Williams*, 979 N.Y.S.2d at 498-99 (insisting that the legislative "language of prohibiting sex offenders from entering school grounds," found in the preamble to the 2005 legislation, expressed the intent to "protect the health and safety of children"). This legislative history—which includes the introductory statement and memorandum of its sponsor that were in the bill jacket submitted to the Governor, after both the State Assembly and Senate had agreed to pass the legislation—is "entitled to considerable weight." *Pataki*, 120 F.3d at 1276-77 (considering the "views of [SORA's] sponsors" contained in its bill jacket); *Williams*, 979 N.Y.S.2d at 498 (considering the same legislative history); *see also Masto*, 670 F.3d at 1054 ("The regulatory explanation of purpose on the face of [the legislation] is substantiated by its legislative history and the structure of the bill."); *Vatore v. Comm'r of Consumer Affairs*, 83 N.Y.2d 645, 649-51 (1994) (according "considerable weight" to the "Joint Sponsors' Memorandum" in the final bill jacket of a statute whose "preemptive intent" was at issue).

The sponsor's introductory statement for the amendments in 2005 to the State's sex offender regime indicated that these amendments were intended "to protect the youngest and most vulnerable members of our society," in view of the fact that sex offenders "pose the most risk to children." Bill Jacket, L.2005, ch. 544 (A. 8894).[34] The memorandum by the sponsor

---

[33] By contrast, the 2006 legislation enacting the current State registration requirements stated that one purpose of these requirements was to protect the public. 2006 N.Y. Sess. Laws Ch. 1 (S. 6409, A. 9472), § 1.

[34] While the "isolated statements" of other individual legislators—and, more so, non-legislators—contained within the legislative history cannot establish legislative intent, *Pataki*, 120 F.3d at 1277, it is noteworthy that the New York Civil Liberties Union, which had most vigorously opposed these amendments, acknowledged that the "well founded" intent of the

also explained that "[t]here is a need to prohibit those sex offenders who are determined to pose the most risk to children from entering upon school grounds or other areas where children are cared for." Memorandum in Support of Legislation, Bill Jacket, L.2005, ch. 544 (A. 8894). Although the sponsor's memorandum did not explicitly mention the residency restriction-related amendment, *see Berlin*, 923 N.Y.S.2d at 834, there is no basis for concluding that the memorandum, in explaining the reason for the amendments as a whole and discussing the overall "need" to protect children, was not directed at all of the amendments.[35]

On their face, the State residency restrictions were intended to prevent certain individuals convicted of serious sex offenses from having access to children. The Supreme Court has reasoned that "an imposition of restrictive measures on sex offenders adjudged to be dangerous is 'a legitimate nonpunitive governmental objective and has been historically so regarded.'" *Smith*, 538 U.S. at 93 (quoting *Kan. v. Hendricks* ("*Hendricks*"), 521 U.S. 346, 363 (1997) (Thomas, J.), a case involving "postincarceration confinement of sex offenders"); *see Bredesen*, 507 F.3d at 1000, 1004 (applying *Smith*'s proposition to another restriction on sex offenders). In short, as the Supreme Court has made clear, the legislature should be afforded the presumption that such measures were intended to be protective and, thus, non-punitive.

The remaining "attributes" of the legislation that instituted these restrictions, such as the "manner of [their] codification," do not otherwise suggest that these restrictions were intended to punish sex offenders. *Smith*, 538 U.S. at 94. First, to the extent that these restrictions, as enacted, only apply to sex offenders while they are on probation or parole, *see Berlin*, 923

legislature was "to protect persons in a vulnerable population from becoming victims of a sex crime." Bill Jacket, L.2005, ch. 544 (A. 8894).

[35] Plaintiffs appear to concede that the legislative history behind the State residency restrictions reflects a regulatory aim to protect children from convicted sex offenders. (*See* Am. Compl. ¶ 23.)

N.Y.S.2d at 834-35, this is not evidence of such intent. Probation and parole are indeed alternative punishments that involve a period of release from prison, subject to certain conditions. *See Griffin v. Wis.*, 483 U.S. 868, 874 (1987) (Scalia, J.) (indicating that "[p]robation, like incarceration, is a form of criminal sanction" that involves a term of "conditional liberty") (quotations omitted); *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972) (Burger, C.J.) (characterizing "parole," *i.e.*, "release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence," as a "variation on imprisonment"). Even so, the fact that a sex offender's alternative punishment of probation or parole possibly triggers, and runs parallel to, these restrictions can be explained by the legislature's intent to employ these restrictions *separately* as a measure to protect children: these restrictions were not meant to enhance the alternative punishment, but to regulate a sex offender as long as he is released on probation or parole, the period in which he is most likely to re-offend. *Accord Bredesen*, 507 F.3d at 1000-1001, 1004 (finding, as non-punitive, a "satellite-based monitoring" restriction for a sex offender on probation or parole, because the fact of his probation or parole rendered him a "violent sexual offender" and, thus, the restriction furnished "intensive supervision" integral to public protection). Meanwhile, it would be illogical to infer that the limited-in-time application of these restrictions to sex offender probationers and parolees is somehow more probative of punitive intent than the limitless application of these restrictions to *all* sex offenders. Therefore, the timing of these restrictions, as applying during probation or parole, does not reflect punitive intent, but rather an effort to tailor these restrictions to the period of greatest risk to the public.

Even if these restrictions are *extensions* of probation or parole, they are, at most, non-punitive conditions that merely attach to the alternative punishments and not punishments

themselves.  *See Fischer*, 2012 WL 4461647, at *3-4 (holding that any "conditions of parole which were attributable to [a sex offender] having been determined to be subject to SORA" *or* other "special conditions of release . . . that the Division of Parole customarily imposes" are not punishments, for purposes of an *ex post facto* or cruel and unusual punishment claim); *cf. Gravino*, 14 N.Y.3d at 558-59 (holding that the "fact and length of postrelease supervision" are "direct consequences of a plea" to any offense, whereas "SORA registration and the terms and conditions of probation" are not).  This conclusion is reinforced by the partial application of these restrictions to sex offenders, as a condition of their probation or parole, only after they are assessed at a risk-level of three based on SORA's non-punitive classification system.  *See, e.g.*, *Windham*, 10 N.Y.3d at 802 (holding that "a SORA risk-level determination is not part of a defendant's sentence").  The fact that at least one application of these restrictions depends on a wholly regulatory, non-criminal determination further undercuts any conclusion that these restrictions constitute punishment.

Second, although the enacting legislation partly codified these restrictions in the New York Penal Law, or cross-referenced these restrictions with other provisions contained therein, *see Berlin* 923 N.Y.S.2d at 834-35, this, in and of itself, does not indicate that these restrictions were meant to be punitive.  The "location and labels" of these restrictions in the New York Penal Law "do not by themselves transform a civil remedy into a criminal one."  *Smith*, 538 U.S. at 94; *see Williams*, 979 N.Y.S.2d at 499 (citing *Smith* with approval).  Notably, the New York Penal Law contains many "provisions that do not involve criminal punishment."  *Smith*, 538 U.S. at 95; *see also, e.g.*, *Coston*, 398 F. Supp. 2d at 885 (holding that, where Ohio's residency restriction is codified in the "criminal section of the Ohio statutes" which also "contains other traditionally civil provisions," it has a "nonpunitive purpose").  For instance, the New York Penal Law

includes civil provisions that solely pertain to the administration of the criminal justice system, such as provisions on the licensing of firearms and fireworks, N.Y. Penal Law § 400.00 *et seq.*; and provisions on the disposal and recovery procedures for seized or stolen property, *id.* § 410.00 *et seq.*

Furthermore, the appearance of these restrictions in an article of the New York Penal Law relating to probation, as well as an article of the New York Executive Law relating to parole, is equally consistent with their exclusive application to sex offender probationers and parolees, which, as stated above, supports a non-punitive purpose. Because these restrictions only apply in this manner, it makes sense that they are codified in sections on probation and parole. Such placement serves only to inform the affected individuals that they may be subject to these restrictions during that period of their release, and does not transform these restrictions into punitive measures. *Accord Valentine*, 2009 WL 9052193, at *3 (holding that "alerting convicted sex offenders of the civil consequences of their criminal conduct," *e.g.*, registration, by "[g]rouping" the provisions regarding such consequences with the provisions regarding the "corresponding criminal offense," "does not render the consequences themselves punitive") (quotations omitted).

### c. Non-Punitive Effect of the State Residency Restrictions

The effect of the State residency restrictions, analyzed using the *Smith* factors, neither contradicts, nor transforms, their non-punitive intent and purpose. *See Smith*, 538 U.S. at 92, 97. First, contrary to the reasoning in *Berlin*, these restrictions cannot be equated to the historical punishment of banishment, *see* 923 N.Y.S.2d at 835; (Am. Compl. ¶¶ 20, 41; Pls. Opp., at 14-15). These restrictions do not have the effect of either putting the affected individuals on display for ridicule or "running them out of town." *Snyder*, 932 F. Supp. 2d at 812 (finding that Michigan's residency restriction "does not provide any means for the public to humiliate or

shame the offender"); *see also Williams*, 979 N.Y.S.2d at 501 ("[The State residency restrictions] cannot be equated with a forced exile from one's home or country.").

Additionally, banishment, as traditionally understood, entailed the inability to ever return to the place from which an individual had been banished. *Smith*, 538 U.S. at 98. By contrast, under the State residency restrictions, sex offenders may venture into restricted areas, even if they cannot reside there and/or access such areas during school hours. *See Williams*, 979 N.Y.S.2d at 500-501 (deciding that the State residency restrictions are also "not similar to [the] historical punishment of banishment," because they do not "require that petitioner abandon any particular geographic area"); *see also, e.g.*, *Miller*, 405 F.3d at 719-20 (concluding that, "[w]hile banishment of course involves an extreme form of residency restriction," Iowa's restriction was "unlike banishment in important respects").

Second, although the State residency restrictions result in an "affirmative" restraint on convicted sex offenders (Am. Compl. ¶ 43), the degree of restraint imposed by these restrictions does not rise to the level of being punitive in effect. *See Smith*, 538 U.S. at 100 ("If the disability or restraint is minor and indirect, its effects are unlikely to be punitive."); *Williams*, 979 N.Y.S.2d at 501-502 (reasoning that, although the State residency restrictions "may cause difficulty in obtaining housing," these restrictions "do[] not impose an affirmative disability or restraint *to the extent that it would render [their] effects punitive*") (emphasis added).[36]

---

[36]     *See also Snyder*, 932 F. Supp. 2d at 811-12 (finding that Michigan's residency restriction "does not restrain the activities of registrants in any way that could be deemed more than minor or indirect," where such individuals are mostly free to "move their residence" and/or "move out of the state"); *Bulles*, 2009 WL 435337, at *6 (concluding that "[t]he Ordinance's requirements constitute an affirmative disability and restraint in that certain sex offenders may not live where they please," but that they "do[] not constitute such a severe restraint, however, to amount to a criminal penalty"); *Coston*, 398 F. Supp. 2d at 885-86 (reasoning that Ohio's residency restriction is a "relatively limited restraint" that does not "constitute[] punishment," although it

Although sex offenders to whom these restrictions apply may be less free than the average person to live or even travel where they want, these restrictions are not the equivalent of imprisonment, and the offenders are not akin to prisoners, without any freedom of movement. The offenders may still freely relocate to other areas in the State or anywhere out-of-state. Indeed, Plaintiffs do not allege that the State residency restrictions have entirely prevented them from establishing a residence or traveling. (*See, e.g.*, Am. Compl. ¶ 41 (only alleging that the State residency restrictions forbid certain sex offenders "from residing within these buffer zones," *i.e.*, 1,000 feet around schools).)

Third, to the extent that these restrictions promote deterrence, consistent with criminal punishment, the deterrent function of these requirements is inconclusive evidence that they are, in fact, punishment, especially considering their non-punitive purpose, as discussed above. *See, e.g.*, *Miller*, 405 F.3d at 720 ("[Iowa's residency restriction] could have a deterrent effect, but we do not agree that the deterrent effect provides a strong inference that the restriction is punishment.").

Fourth, these restrictions themselves are not retributive in nature: they do not serve the "traditional aim[]" of punishing a sex offender for his "wrongdoing," but rather they regulate his "risk" to children. *Smith*, 538 U.S. at 97, 102; *see also Williams*, 979 N.Y.S.2d at 503 ("The

---

"does impose an affirmative restraint or disability"); *cf. Hudson v. U.S.*, 522 U.S. 93, 104 (1997) (Rehnquist, C.J.) (holding that sanctions for federal banking violations "do not involve an 'affirmative disability or restraint,' as that term is normally used," because "[w]hile petitioners have been prohibited from further participating in the banking industry, this is certainly nothing approaching the infamous punishment of imprisonment") (quotations omitted); *Hobbs v. Cnty. of Westchester*, 397 F.3d 133, 157-58 (2d Cir. 2005) (rejecting an *ex post facto* challenge to a restriction on certain public speech by convicted sex offenders, which "might be considered an affirmative restraint," but was, at best, a minor restraint that "d[id] not resemble the punishment of imprisonment" because the offenders could still "engage in expressive activity" despite the restriction) (quotations omitted), *cert. denied*, 546 U.S. 815 (2005).

[State sex offender residency] statute is not retributive. It does not punish a sex offender's past conduct, but seeks to defend children from the risk of future recidivism[.]"). The non-retributive nature of the State residency restrictions, like the registration requirements, is evidenced by their application, in part, based on the multi-factored assessment of a sex offender's risk-level, taking into account more than the offense for which he was convicted. Reliance on this assessment ensures that these restrictions are only applied to the offenders most likely to re-offend and who, thus, pose the greatest risk of harm to children, *i.e.*, risk-level three offenders and non-risk-level three offenders whose offense involved a child, and not simply to *any* offenders who commit the same offense.

While "any restraint or requirement imposed on those who commit crimes is at least potentially retributive in effect," the "potentially retributive" effect of the State residency restrictions is incidental to the criminal punishment and not itself retributive. *Miller*, 405 F.3d at 720 (ruling that, in spite of any "retributive" effect, Iowa's residency restriction was "consistent with the legislature's regulatory objective of protecting the health and safety of children"); *cf. Pataki*, 120 F.3d at 1283 (reasoning that SORA, in particular its notification provisions, "does not affix culpability for prior conduct," rendering it retributive, but only "relies on such conduct solely for the evidentiary purpose of determining whether the offender is likely to present a danger to the community once he is released") (quotations omitted). This effect is largely an illusion based on the limited nexus between these restrictions and the seriousness of the offender's crime. This nexus, however, is better explained by the regulatory aim to protect children from the riskiest sex offenders—adjudged through their risk-level or commission of an offense against a child—than the imposition of retribution for the offenders' wrongdoing.

Therefore, there is no retribution that these restrictions seek, merely for the sake of retribution, that might support the inference that they are, in fact, punishment.

The final inquiry, into the relationship and proportionality of the State residency restrictions to their intended purpose, also indicates that these restrictions are not punishment. *See Miller*, 405 F.3d at 721 (holding that, even where sex offender residency restrictions are deemed an "affirmative" restraint for purposes of punishment, "this factor ultimately points us to the importance of the [final] inquiry: whether the law is rationally connected to a nonpunitive purpose, and whether it is excessive in relation to that purpose"). Tellingly, the *Berlin* court did not contest the first half of this inquiry, *i.e.*, the "rational connection to a nonpunitive purpose," which was the "most significant factor" in the Supreme Court's punitiveness determination in *Smith*. *Smith*, 538 U.S. at 102 (quotations omitted); *see Berlin*, 923 N.Y.S.2d at 835-36 (arguing that the State residency restrictions are "excessive," without addressing whether they are reasonably related to any non-punitive purpose). Given the "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class," as acknowledged by the Supreme Court, there clearly is a "rational connection" between the State residency restrictions and the legislature's intent to protect children. *Smith*, 538 U.S. at 102-103. By minimizing contact between children and convicted sex offenders after their release from prison, these restrictions reduce the chance that a sex offender might re-offend against a child victim.[37] *See, e.g.*, *Weems*, 453 F.3d at 1015 ("[A] residency restriction designed to reduce proximity between the most dangerous offenders and locations frequented by children is within the range of

---

[37] Even if the legislature could have minimized such contact without restricting the residence of sex offenders near schools, the "lack[] [of] a close or perfect fit with the nonpunitive aims [these restrictions] seek[] to advance" does not defeat their "rational connection." *Smith*, 538 U.S. at 102-103.

rational policy options available to a state legislature charged with protecting the health and welfare of its citizens."); *Miller*, 405 F.3d at 721 ("In light of the high risk of recidivism posed by sex offenders, the legislature reasonably could conclude that [Iowa's residency restriction] would protect society by minimizing the risk of repeated sex offenses against minors.") (citations omitted); *Bulles*, 2009 WL 435337, at *6 (reasoning that Allentown's residency restriction "could prevent re[c]idivist [sic] assaults on children," and thereby serve to "protect the community"); *Baker*, 2006 WL 905368, at *5 (concluding that Georgia's residency restriction was an "appropriate step in achieving the ultimate goal of protecting children," since "such a restriction upon residence would reduce the likelihood and opportunities for recidivism"); *Williams*, 979 N.Y.S.2d at 503 (arguing that, in light of a sex offender's "potential threat to children," the State residency restrictions "rationally seek[] to lessen [his] contact with children" by "creating a buffer around schools").

Credible data, suggesting that "concerns" over the recidivism risk among convicted sex offenders might be misplaced or overstated (*see* Am. Compl. ¶ 33 (citing a study by the United States Department of Justice, alleging that "95% of new sex crimes are committed by people other than registered sex offenders")[38]; Pls. Opp., at 13 ("97 percent of sex crimes committed are committed by someone who is not on the registry.")), does not undermine the "rational connection" between restrictions on convicted sex offenders and the goal of protecting children.

---

[38] Although the accuracy of Plaintiffs' representation about the Department of Justice's study does not affect the above reasoning, it appears that Plaintiffs mistakenly translated the 5.3% "re-offense rate" among convicted sex offenders, documented in the study, to mean that "95% of new sex crimes are committed by people other than registered sex offenders." (Am. Compl. ¶ 33); *see Cunningham*, 2007 WL 712392, at *12 (citing a 2003 DOJ study). That is, the fact that 5.3% of convicted sex offenders re-offend does not necessarily mean that their repeat offenses account for only 5.3% of all sex offenses being committed by new offenders *and* re-offenders.

The implicit argument—that there is no need for residency restrictions which focus on convicted sex offenders, when such individuals only account for a fraction of all sex offenses—raises an issue of "efficacy" and "not whether the statute has a connection to a nonpunitive purpose." *Snyder*, 932 F. Supp. 2d at 813 (rejecting the argument that restricting the residency of registered sex offenders is irrational since "sex offender registry laws do not, in fact, reduce recidivism rates"); *see also Bulles*, 2009 WL 435337, at *6 (ignoring "social scientifi[c] [sic] research which suggests sex offender residency restrictions are i[n]effective [sic]"); *cf. Masto*, 670 F.3d at 1057 (concluding that, regardless of whether *Smith* "overstated the risk of sex-offender recidivism" with studies cited therein, "a recalibrated assessment of recidivism risk would not refute the legitimate public safety interest" in Nevada's registration requirements). "[I]t is not for a federal court to tell a state legislature whether a particular law is effective or not." *Snyder*, 932 F. Supp. 2d at 813.[39]

Having concluded that the State residency restrictions are reasonably related to their non-punitive purpose of protecting children, the Court considers whether these restrictions are reasonably proportional with respect to achieving this purpose. *See Smith*, 538 U.S. at 105 ("The question [when evaluating excessiveness] is whether the regulatory means chosen are reasonable in light of the nonpunitive objective."). Because these restrictions are tailored to impose the greatest restrictions on the riskiest sex offenders, the Court finds that they are reasonably proportional to their non-punitive purpose of protecting children. *Id.* (upholding Alaska's

---

[39] Of course, however, if there, in fact, exists credible data indicating a low rate of recidivism among convicted sex offenders, that would be a factor that the State and municipal legislatures could consider in evaluating the efficacy of, and reconsidering the need for, the sex offender residency restrictions. *See Miller*, 405 F.3d at 715 ("The legislature is institutionally equipped to weigh the benefits and burdens of various distances [for sex offender residency restrictions], *and to reconsider its initial decision in light of experience and data accumulated over time*.") (emphasis added).

registration requirements, where the "regulatory means chosen" by the legislature were reasonable in light of its goal to protect children from convicted sex offenders).

The State residency restrictions apply to sex offender probationers and parolees convicted of an offense against a child under 18-years old, and all risk-level three sex offender probationers and parolees. N.Y. Exec. Law § 259-c(14); N.Y. Penal Law § 65.10(4-a). These restrictions, therefore, are limited in their application to two, possibly overlapping, populations of sex offenders that the legislature has assessed as presenting the severest threat to children. Notably, sex offenders in risk-levels one and two who have not committed an offense against a child are not subject to these restrictions. With respect to risk-level three sex offenders, although they might not have originally committed an offense against a child, their classification as a risk-level three entails an individualized determination that the offender, especially during his immediate release on probation or parole, poses the highest risk of re-offending against a child *or* adult victim. *See Williams*, 979 N.Y.S.2d at 498 (quoting the sponsor's memorandum about a risk-level three offender's high risk of re-offending, "no matter what the age of the victim" was originally); *see also Weems*, 453 F.3d at 1017 (reasoning that Arkansas's residency restriction, which only applies to sex offenders in the two highest risk-levels, "calls for a particularized risk assessment" of assorted factors and, thus, "increases the likelihood that the residency restriction is not excessive"); *cf. Smith*, 538 U.S. at 104 (suggesting that Alaska's registration requirements would stand on even stronger footing, in terms of the excessiveness factor, if they "require[d] individual determination of [a sex offender's] dangerousness"). By tailoring their application to sex offenders most likely to re-offend in general or, more specifically, to re-offend against a child, these restrictions constitute a reasonably proportional "regulatory means" to protect children. *Smith*, 538 U.S. at 105.

The same conclusion can be drawn about the application of these restrictions to sex offenders who have committed an offense against a child, even though it does not entail the same individualized determination. (Am. Compl. ¶ 41 & at 19.) Although these restrictions apply to any sex offender probationer or parolee whose crime involved a child, regardless of the offender's risk-level, the fact that he was originally convicted of an offense against a child is adequate to justify this particular application. A conviction of such an offense demonstrates that the offender is capable of harming children and, thus, poses precisely the threat that these restrictions seek to neutralize, during the offender's probation or parole. *See Miller*, 405 F.3d at 721-22 (holding that Iowa's "categorical" residency restriction for all child sex offenders is "not 'excessive,'" despite the district court's finding that "the law applies regardless of whether a particular offender is a danger to the public") (quotations omitted); *Williams*, 979 N.Y.S.2d at 502-503 (rejecting the claim that the State residency restrictions "do[] not require or permit any individual assessment of an offender's dangerousness," and arguing that, "given the nature of [the plaintiff's] crime," *i.e.*, against a child, "he might be reasonably viewed as a potential threat to children" to whom these restrictions should apply). The mere possibility of more effective or narrower means to protect children from sex offenders does not render the State residency restrictions disproportionate. The "best choice" is not the only choice; the "regulatory means chosen" by the State legislature should be upheld if they are "reasonable in light of the nonpunitive objective." *Smith*, 538 U.S. at 105 ("The excessiveness inquiry of our *ex post facto* jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy."); *see also Bulles*, 2009 WL 435337, at *6 ("Even if the Ordinance is not the most effective means to protect the community, it is rationally connected to this goal and not excessive in light of this purpose.").

Accordingly, because the intent, purpose, and effect of the State residency restrictions are non-punitive, the Court dismisses, with prejudice, Plaintiffs' *ex post facto* claim relating to these restrictions.

### D. The Other Parties' Motions to Dismiss

The Court now turns to the arguments for dismissal made by the County Defendants, the Town, and CHI.

#### 1. Preemption Claims Regarding the County and Town Residency Restrictions

As an initial matter, the Court declines to consider Plaintiffs' supplemental state law claims of preemption relating to the County and Town residency restrictions *prior to* addressing the *ex post facto* claims relating to these restrictions. In making this decision, the Court is mindful of the principle that "dispositive state law claims pendent to federal constitutional claims" should be decided first, where deciding the former would resolve the whole case "without reference to" the latter and, thus, entirely avoid "constitutional adjudication" when it is "not absolutely essential" to the case. *Hagans v. Lavine*, 415 U.S. 528, 546, 547 n.12 (1974) (White, J.) (quotations omitted) (discussing the doctrine established in *Siler v. Louisville & Nashville R.R. Co.*, 213 U.S. 175, 193 (1909), and collecting other cases); *see also Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.") (citing *Siler*).

Here, however, resolution of the preemption claims would not be "dispositive" of the federal constitutional claims. *Hagans*, 415 U.S. at 546, 547 n.12. Even if the Court were to address the preemption claims prior to the *ex post facto* claims relating to the County and Town residency restrictions, it would still have to resolve the *ex post facto* claim relating to the State residency restrictions *and* the equal protection claim relating to the County's trailer program.

Furthermore, having addressed the *ex post facto* claim relating to the State residency restrictions, the Court has already, in effect, analyzed the central issues that would apply to the remaining *ex post facto* claims relating to the County and Town residency restrictions.  In other words, the Court cannot simply address the preemption claims "without reference to" the federal constitutional claims, and, thus, at least some adjudication of the latter is "absolutely essential" to resolving this case.  *Id.* at 546, 547 n.12; *compare Mayor of Phila. v. Educ. Equal. League*, 415 U.S. 605, 623-24 (1974) (Powell, J.) (rejecting the "assertion that pendent jurisdiction is appropriate and that pendent state claims should be decided first" based on the *Siler* doctrine, where a decision on such claims "would not have approached resolving the case"), *with Moore v. Cnty. of Suffolk*, 851 F. Supp. 2d 447, 459 (E.D.N.Y. 2012) (applying the *Siler* doctrine, where "deciding the state law claim will likely make it unnecessary to consider plaintiff's constitutional claims").

Furthermore, as the Second Circuit recently confirmed in *Carver v. Nassau County Interim Finance Authority*, 730 F.3d 150 (2d Cir. 2013), federal district courts should refrain from asserting their supplemental jurisdiction to adjudicate any issue of state law, such as preemption, where the state-law precedent is not well-settled.  *See id.* at 154-55.  There remains an undecided issue of state law with respect to whether the State's sex offender regime preempts municipal sex offender residency restrictions.  *Compare Moore v. Cnty. of Suffolk*, No. 09-CV-2031, 2013 WL 4432351, at *5 (E.D.N.Y. Aug. 14, 2013) (collecting state court cases in support of preemption), *with People v. Diack*, 974 N.Y.S.2d 235, 238 (Sup. Ct. App. Term Sept. 5, 2013) ("We therefore hold that [Nassau County's residency restrictions] are not preempted by state law[.]"), *leave to appeal granted*, 22 N.Y.3d 1155 (2014).

2. <u>Failure to State a Claim</u>

    i. *Ex Post Facto* Claims Relating to the County and Town Residency Restrictions

Like the State, the County Defendants and the Town contend that Plaintiffs have failed to state an *ex post facto* claim with respect to the County and Town residency restrictions, in light of the Supreme Court's ruling and relevant framework in *Smith*. (*See* County Defs. Br., at 3-14; Epley Br., at 10.) The Court agrees.

    *a. Retroactivity*

As an initial matter, all eight Plaintiffs with standing to challenge these restrictions—Plaintiffs Wallace, Aiello, Blunt, Calloway, Colon, Factor, Geoffrion, and McLaurin—are subject to their retroactive application, *except* that the County residency restrictions do not apply retroactively to Plaintiffs Aiello and Factor. Plaintiffs Aiello and Factor committed their offenses more than one year after the County residency restrictions took effect in 2006. *See supra* Sections I.A. & I.B.2.ii-iii.

    *b. Non-Punitive Intent and Effect of the County and Town Residency Restrictions*

For the most part, the Court's reasoning as to the State residency restrictions, *see supra* Section II.C.3.ii, applies equally to the County and Town residency restrictions, in support of the conclusion that these restrictions are not punitive in their intent, purpose, and effect. There are, however, three ways in which the analyses for these restrictions differ, thus warranting further discussion but the same conclusion.

    (1) Legislative Intent

First, in terms of their non-punitive legislative intent, the County and Town residency restrictions stand on stronger footing than the State residency restrictions. In contrast to the State legislature, the County and Town legislatures "expressed," on the face of the enacting legislation,

67

a regulatory aim for adopting their own residency restrictions. *Smith*, 538 U.S. at 93. The County's enacting legislation codified a "[l]egislative intent" provision, indicating that its objective was to "protect" against the "unreasonable threat to the safety and well-being of children" posed by sex offenders. Cnty. Code § 745-1. Similarly, the preamble to the Town's enacting legislation stated that its purpose was "not to punish sex offenders, but rather to provide a regulated system that prevents sex offenders from residing in areas where large numbers of children learn, play, congregate and travel," since children are "particularly in need of protection from the unreasonable threat of sex offenders" based on their "risk of repeat offense." (Dkt. No. 68-2.)

Because the County's and the Town's enacting legislation incorporated express statements that they intended their residency restrictions to protect and not punish, the Court need not also look to the legislative history behind the enactments to impute such intent.[40] Nor is such intent negated by other "attributes" of the enacting legislation—like the fact that these restrictions "[i]nvok[e] the criminal process in aid of [their] statutory regime," by making non-compliance separately punishable as a misdemeanor, *see* Cnty. Code § 745-5; Town Code § 215-4; (Am. Compl. ¶ 30). *Smith*, 538 U.S. at 94-96, 101-102; *see supra* Section II.C.3.i.

(2) Retributive Effect

Second, although the County and Town residency restrictions are not as narrowly tailored as the State residency restrictions, they are not retributive in nature. The County residency restrictions prevent any convicted sex offender who is required to register, pursuant to the State registration requirements, from living within a 1/4 mile of a school, nursery, licensed daycare,

---

[40]     As with the State residency restrictions, Plaintiffs again appear to concede that a non-punitive intent prompted the County and Town residency restrictions. (*See* Am. Compl. ¶ 27.)

playground, amusement park, or the residence or place of employment of the offender's victims. Cnty. Code §§ 745-2, 745-3.  The Town residency restrictions prevent any risk-level two or three sex offender, subject to registration, from living within one mile of a school that does not transport students who live within one mile thereof, 2,000 feet of a school that does, and 2,000 feet of any childcare or municipal recreational facility.  Town Code §§ 215-1, 215-2.  The County and Town residency restrictions, however, both contain grandfather clauses, exempting an affected individual whose residence is established prior to the enactment of these restrictions or prior to the building of schools and other facilities to which these restrictions apply.  Cnty. Code § 745-4; Town Code § 215-3.

The application of the County residency restrictions to *all* convicted sex offenders might suggest a retributive effect.  These restrictions, however, do not apply with equal, or even commensurate, force to all offenders.  The *duration* of these restrictions depends on whether an individual is classified as a risk-level one sex offender required to register for 20 years, or a risk-level two or three sex offender required to register for life.  *See supra* Sections I.B.1 & I.B.2.ii.  These restrictions apply only as long as a sex offender is required to register under the State's sex offender regime, which, in turn, is based on an assessment of various factors, *including but not limited to* the offense for which the offender was convicted.  *See supra* Section II.C.3.i.  Conceivably, a sex offender convicted of a more serious offense but assessed as a risk-level one offender could be subject to these restrictions for a shorter period of time than a sex offender convicted of a less serious offense but assessed as a risk-level two or three offender.  In other words, the length of time for which these restrictions apply does not correspond directly with the "extent of [an individual's] wrongdoing," but rather to the "extent of [his] risk," which, thus, weakens the inference that these restrictions are retributive.  *Smith*, 538 U.S. at 102 (quotations

omitted); *cf. Snyder*, 932 F. Supp. 2d at 812 (refusing to find that Michigan's residency restriction for sex offender registrants, classified into three possible tiers, was retributive, even though "[the restriction] is imposed equally upon all offenders based on their past crime, and no consideration is given to their individual risk"). The same is true of the Town residency restrictions, which only apply to registered risk-level two and three sex offenders and, thus, are not imposed based on the extent of an offender's wrongdoing, but the risk that he poses to the community. *Smith*, 538 U.S. at 102.

Any retributive effect attributable to the County and Town residency restrictions is also undercut by the grandfather clauses contained in each, which exempt the prior-established residences of sex offenders otherwise required to comply with these restrictions. Cnty. Code § 745-4; Town Code § 215-3. In other words, these restrictions seek to avoid being retributive by depriving a sex offender of, or taking from him, his preexisting property rights based solely on his conviction. These clauses all but ensure that these restrictions will not be applied uniformly to convicted sex offenders who are identical in terms of their offenses: one may be allowed to occupy a prior-established residence in a restricted area, while the other, absent such a residence, may be required to leave that area. The above scenario ultimately contradicts the suggestion that these restrictions "affix culpability" for "wrongdoing." *Smith*, 538 U.S. at 102; *Hendricks*, 521 U.S. at 362. Indeed, a sex offender with the same "culpability" as another might be free from these restrictions, based on his mere possession of a prior-established residence. *Hendricks*, 521 U.S. at 362.

### (3) Proportionality

Compared to the State residency restrictions, the County and Town residency restrictions raise more concerns about their proportionality to the non-punitive purpose of child protection. Notably, as the jurisdictions become smaller, the restrictions on convicted sex offenders become

larger and more numerous:  from buffer zones of *1,000 feet* around schools within *the State*; to *1/4 mil*e around schools and other child-related facilities within *the County*; to *one mile* around some schools and *2,000 feet* around other schools and child-related facilities within *the Town*. Although it is a closer call than with the State residency restrictions, the Court does not find that the broader geographical restrictions imposed by the County and Town residency restrictions are excessive in relation to their purpose. *Smith*, 538 U.S. at 105.

The County and Town residency restrictions are comparable to restrictions that other federal courts have found to satisfy the proportionality inquiry. *See, e.g.*, *Weems*, 453 F.3d at 1013, 1017 (Arkansas's 2,000-foot restriction on "Level 3 'high risk' offenders and Level 4 'sexually violent predators'" from residing around schools and daycare centers, with an exemption for prior-established residences); *Snyder*, 932 F. Supp. 2d at 807, 811-13 (extension of Michigan's 1,000-foot restriction on registered sex offenders from "working, residing, or loitering" around schools to "Tier III" offenders "now required to register for life," with an exemption for prior-established residences and places of employment); *Gautier*, 2009 WL 1444533, at *8-9 (Oklahoma's 2,000-foot restriction on any "registered sex offender," including a "level III" offender registered for life, from residing around schools, daycare centers, playgrounds, *and* parks, with an exemption for prior-established residences); *see also, e.g.*, *Valentine*, 2009 WL 9052193, at *1, 5 (Ohio's 1,000-foot restriction on any registered sex offender, including a "Tier III" offender subject to lifetime registration, from residing around schools and daycare centers); *Baker*, 2006 WL 905368, at *1, 5 ("No [sex offender in Georgia] required to register . . . shall reside within 1,000 feet of any child care facility, school, or area where minors congregate.") (quotations omitted).

The fact that these restrictions apply for life to risk-level two and three sex offenders (Pls. Opp., at 20) does not render them disproportionate to their cause. On the contrary, it is reasonable for these restrictions to dovetail the lifetime registration requirement, because the registration requirement rests on the State's determination that a risk-level two or three sex offender poses a perpetual threat of re-offending. This determination informs the County's and Town's decisions to restrict the offender's residence for the same duration. Because the State registration requirements, and, by extension, the County and Town residency restrictions, rely on a "particularized risk assessment" to ensure that the "length and extent of" such regulations are tailored to this end, they are "not excessive." *Weems*, 453 F.3d at 1017 (ruling, with respect to a residency restriction that only applies to registered Level 3 and 4 sex offenders, that "the . . . statutory plan calls for a particularized risk assessment of sex offenders, which increases the likelihood that the residency restriction is not excessive in relation to the rational purpose of minimizing the risk of sex crimes against minors"); *Valentine*, 2009 WL 9052193, at *5 (rejecting the argument that "lifetime registration, notification, and residency restrictions [for Tier III sex offenders] are arguably excessive," since "the . . . tiered classification system takes into account the nature of the underlying offense in assessing the length and extent of the sanction"); *see also Gautier*, 2009 WL 1444533, at *9 (holding that "[r]equiring sex offenders to register and limiting where they may live are reasonable means of protecting public safety," even in terms of risk-level III sex offenders subject to those regulations "for life") (emphasis omitted).

Moreover, any excessiveness relating to the lifetime application of these restrictions to risk-level two and three sex offenders is further mitigated by the grandfather clauses exempting an offender's prior-established residence. *Snyder*, 932 F. Supp. 2d at 811-12 ("The statute exempted those already living or working in such zones and those whose home or place of

employment enters the zones due to relocation or establishment of a school there. These accommodations significantly negate the harshest potential consequences of the Act."); *cf. Baker*, 2006 WL 905368, at *5 (refusing to find that, without such a clause, the statute was excessive, since "[i]t is antithetical to [the statute's] purpose . . . to allow these individuals to continue to reside inside that restricted area simply because they were fortunate enough to have established their residence prior to the statute's effective date").

With respect to the County residency restrictions, their application to all convicted sex offenders, regardless of their risk-level (Am. Compl. ¶ 29 & at 19), does not render these restrictions disproportionate. *See Snyder*, 932 F. Supp. 2d at 807, 813 (concluding that the statutory scheme, which contained a residency restriction for *all* "registrants," was not excessive, despite the claim that "the registry includes individuals who neither pose a danger to the public nor are likely to reoffend"); *Valentine*, 2009 WL 9052193, at *1, 5 (holding that, even where "the likelihood of recidivism or dangerousness is not evaluated for each offender individually" in classifying them, the statutory scheme, which imposed registration requirements and residency restrictions on "*all* offenders" based on their classification, was still not excessive) (emphasis added); *Gautier*, 2009 WL 1444533, at *8-9 (rejecting the argument that "the absence of an individualized risk assessment mechanism renders the statute excessive," where the statute included a residency restriction that applied to *any* "registered sex offender"); *Baker*, 2006 WL 905368, at *1, 5 (declining to deem excessive the residency restriction, even though it applied to *any* "individual required to register").

Rather, the same individualized risk assessment that imposes a lifetime registration requirement on risk-level two and three sex offenders and a 20-year registration requirement on risk-level one sex offenders throughout the State triggers the co-extensive and commensurate

residency restrictions in the County and the Town.  The fact that imposing such restrictions on risk-level one sex offenders might not be the "best choice" does not make it unreasonably disproportionate to the aim of protecting children.  *Smith*, 538 U.S. at 105; *see also Gautier*, 2009 WL 1444533, at *9 (holding that, even if "[r]equiring sex offenders to register and limiting where they may live" does not "represent the best choice among all possible alternatives for protecting the public," "reasonableness is all that the *Ex Post Facto* Clause requires"); *accord Pataki*, 120 F.3d at 1283 ("The legislature is not required to act with perfect precision, and its decision to cast a net wider than what might be absolutely necessary does not transform an otherwise regulatory measure into a punitive sanction.").

The Supreme Court's guidance in *Smith* is instructive:

> The *Ex Post Facto* Clause does not preclude a State [or municipality] from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences.  We have upheld against *ex post facto* challenges laws imposing regulatory burdens on individuals convicted of crimes without any corresponding risk assessment. . . . The . . . determination to legislate with respect to convicted sex offenders as a class, rather than require individual determination of their dangerousness, does not make the statute a punishment under the *Ex Post Facto* Clause.

538 U.S. at 103-104 (citations omitted).  The County, in this case, concluded that it would "legislate" residency restrictions that apply to *all* convicted sex offenders, regardless of the "individual determination of their dangerousness." *Id.*  At the same time, the County did not dispense with this determination altogether, but incorporated it, basing its residency restrictions on the regulatory structure of the State registration requirements.  *Id.*  Such a balanced arrangement of "regulatory burdens" seems reasonable, based on the framework outlined in *Smith*. *Id.*

Finally, the more significant aspect relating to the *effect* of the County residency restrictions is that, as alleged by Plaintiffs, these restrictions have, at times, rendered, and are

capable of rendering, them and other sex offenders homeless, *see supra* Sections II.B.2 & II.B.3. There is, however, no support for Plaintiffs' allegation that these restrictions directly cause forced or *de facto* homelessness among the County's registered sex offenders.  Plaintiffs do not allege that these restrictions leave offenders with practically no place to live within the County. (*See, e.g.*, Am. Compl. ¶¶ 29, 43 (only alleging that the County residency restrictions "restrain[] [registered sex offenders] from living in *certain* areas" and that these restrictions "*oftentimes* uproot[] offenders from their communities") (emphasis added).)  Nor can Plaintiffs allege as much.  Among those with standing to challenge these restrictions, Plaintiffs Colon, Geoffrion, and McLaurin have registered primary residences in the County on the State's sex offender registry website (Exs. E; G; H),[41] which supports the conclusion that these restrictions do not "make it impossible for a registered sex offender to live in [the County]."  *Baker*, 2006 WL 905368, at *4 (taking judicial notice of a sex offender's ability to "find an affordable residence" not subject to the residency restriction, *and* the fact that "Plaintiff has found a residence in the county where he can live," to support the same conclusion).  Furthermore, this website confirms that certain of the 1,009 registered sex offenders residing within the County are not homeless; in fact, there are only 219 offenders in the entire State who even identify as homeless on this website.  (Ex. J.)[42]

While Plaintiffs do not expressly allege that the Town residency restrictions also leave them and other sex offenders homeless, they do allege that these restrictions amount to *ex post*

---

[41]    Under its sex offender regime, the State "establish[es] and maintain[s] a file of individuals required to register," including information on their "home address and/or expected place of domicile."  N.Y. Correct. Law § 168-b.

[42]    These statistics on the State's sex offender registry website, appended as Exhibit J, are also judicially-noticeable information, because they are based on the other information of which the Court has already taken notice.  *See supra* Section I.A & note 8.

*facto* violations.  (Am. Compl. ¶ 3.)  As such, the Court similarly considers whether the effect of these restrictions, by creating a larger buffer zone around schools and child-related facilities within a smaller geographical area than the County, raise genuine concerns regarding forced or *de facto* homelessness among the Town's registered sex offenders.  On the contrary, a map depicting the geographical area of the Town, as reproduced by its Division of Geographic Information Systems,[43] reflects the fact that 45.5% of the Town's 88-square-miles of habitable land,[44] *i.e.*, 40.11 square miles, is *not* covered by these restrictions and, thus, available to sex offenders and non-sex offenders alike.[45]  (Dkt. Nos. 94-1; 96.)  In the end, Plaintiffs have failed to allege that the Town residency restrictions effectively preclude registered sex offenders from residing within the Town.

Having concluded that the County and Town residency restrictions are not so disproportionate in their effect as to cause the homelessness of registered sex offenders residing therein, the Court need not engage in further line-drawing as a constitutional matter.  Whether

---

[43] The Court takes judicial notice of the Town's map, which was produced in response to the Court's request during the May 13, 2014 oral argument, as a depiction of the habitable geographical areas that are, and are not, covered by the Town residency restrictions. *Cf. Boyce Motor Lines, Inc. v. U.S.*, 342 U.S. 337, 344 (1952) (Jackson, J., dissenting) ("We may, of course, take judicial notice of geography."); *W. Mohegan Tribe & Nation v. Orange Cnty.*, 395 F.3d 18, 22 n.3 (2d Cir. 2004) (per curiam) (taking judicial notice of "submerged lands" in the areas relating to the plaintiff's claims, "[a]lthough the complaint is not specific in this regard"); *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 701 (S.D.N.Y. 2011) ("[T]he Court may consider the maps provided by Defendants concerning the zoning of the properties and their surrounding areas as public documents, of which judicial notice may be taken.").

[44] The geographical area of the Town is approximately 140 square miles *in total*, but 52 square miles are uninhabitable by anyone.  (Dkt. No. 94-1.)

[45] In a letter submitted by the Town after its production of the map, it acknowledged that 1.5% of the habitable land lies on the Shinnecock Indian Nation reservation, and is, thus, only habitable by members of the Shinnecock Indian Nation.  (Dkt. No. 96); *cf. W. Mohegan Tribe & Nation*, 395 F.3d at 22 n.3 (applying the information regarding "submerged lands," of which it took judicial notice, to "the Tribe's land claim" with respect to such lands).

narrower geographical restrictions than the ones currently imposed by the County and the Town would achieve a greater balance is an inquiry reserved for government officials or legislators, not the Court. *See Miller*, 405 F.3d at 715. Unlike the Court, whose concern is reasonableness, "[t]he legislature is institutionally equipped *to weigh the benefits and burdens of various distances*, and to reconsider its initial decision in light of experience and data accumulated over time." *Id.* (emphasis added).[46]

In sum, although the analysis for the County and Town residency restrictions involves other considerations regarding legislative intent, retribution, and proportionality, the conclusion remains: like the State residency restrictions, the County and Town residency restrictions are not so punitive *in fact* as to plausibly overcome the non-punitive intent with which these restrictions were first enacted. Accordingly, the Court dismisses with prejudice the *ex post facto* claims relating to the County and Town residency restrictions.[47]

---

[46] Indeed, the County and Town legislatures may wish to "reconsider" the application of their residency restrictions, the scope and complexity of which make it difficult for registered sex offenders to find suitable places to live within those jurisdictions. *Miller*, 405 F.3d at 715. As previously noted with respect to the State residency restrictions, the existence of credible data indicating a low rate of recidivism among registered sex offenders might also give good reason to reconsider the County and Town residency restrictions. *Id.*

[47] To the extent that Plaintiffs vaguely allude to claims that the State, County, and Town residency restrictions violated "substantive due process" (Am. Compl. ¶ 44), such claims are also unavailing. With respect to such claims, there are no "fundamental liberty interests" implicated by these restrictions, which warrant strict scrutiny. *Reno v. Flores* ("*Flores*"), 507 U.S. 292, 302 (1993) (Scalia, J.) (quotations omitted) (collecting cases); *see Miller*, 405 F.3d at 709-16 ("We do not believe that the [sex offender] residency restriction . . . implicates any fundamental right of [the plaintiffs] that would trigger strict scrutiny of the statute.").

First, although Plaintiffs reference the right to "live wherever they so choose" (Am. Compl. ¶ 23), this right is not fundamental to our constitutional order. *See Stone v. Pamoja House*, 111 F. App'x 624, 626 (2d Cir. Oct. 6, 2004) (dismissing "due process claim," based on the alleged "entitlement to reside in the shelter of [the plaintiff's] choice"). Second, these restrictions fail to trigger the fundamental right to *inter*state and/or *intra*state travel (Am. Compl. ¶ 29), because they neither distinguish between new and long-term sex offenders residing in the State, the County, or the Town, such that the former are discouraged from traveling. Nor do

ii. Equal Protection Claim Relating to the County's Trailer Program

a. *Against the County*

The County Defendants posit that Plaintiffs' equal protection claim relating to the County's trailer program should be dismissed under rational basis review. (Dkt. No. 69-8 ("County Defs. Reply"), at 1-2.) The Court agrees.

"Social and economic legislation . . . that does not employ *suspect classifications* or impinge on *fundamental rights* must be upheld against equal protection attack when the legislative means are *rationally related to a legitimate governmental purpose*." *Hodel v. Ind.*, 452 U.S. 314, 331 (1981) (Marshall, J.) (emphasis added) (citing, *inter alia*, *Schweiker v. Wilson*, 450 U.S. 221 (1981) (Blackmun, J.)); *see also San Antonio Indep. Sch. Dist. v. Rodriguez* ("*Rodriguez*"), 411 U.S. 1, 17 (1973) (Powell, J.) (same). In such a situation, rational basis review does not permit the judiciary to "substitute its policy judgment" for that of the legislature. *Hodel*, 452 U.S. at 331; *see also City of New Orleans v. Dukes* ("*Dukes*"), 427 U.S. 297, 303

---

these restrictions block sex offenders from traveling between states, counties, or towns. *See Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 53-54 (2d Cir. 2007) (dismissing a claim predicated on the right of interstate travel, because the challenged law did not (i) "distinguish between persons based upon geography" *or* (ii), despite "minor restrictions" on movement, otherwise "deter[]" or "impede" travel) (quotations omitted); *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648-49 & n.5 (2d Cir. 1971) (recognizing the "right to travel *within* a state" as a corollary to the "right to travel *between* states," and concluding that such rights are infringed when a challenged law provides "that each community should take care of its own first") (emphasis added; quotations omitted). *See also Miller*, 405 F.3d at 713-14 (holding that, assuming there is a right to intrastate travel, "the Iowa [sex offender residency restriction] would not implicate a right to intrastate travel for the same reasons that it does not implicate the right to interstate travel"; and that "[w]e are . . . not persuaded that the Constitution establishes a right to 'live where you want'").

Therefore, these restrictions are solely subject to rational basis review, pursuant to which the Court has already concluded that these restrictions are reasonably related to a legitimate purpose. *See supra* Sections II.C.3.ii & II.D.2.i; *Flores*, 507 U.S. at 306. Accordingly, the Court dismisses with prejudice any substantive due process claims that Plaintiffs intended to assert.

(1976) (per curiam) ("[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines[.]").

Here, the claim is that the County established a trailer program which ultimately exposed homeless sex offenders to unequal living conditions, by providing them with less access to education, employment, therapy, and showers than "other free men." (Am. Compl. ¶¶ 45-46.) This claim, as it stands, fails to allege any "fundamental rights" that the trailer program might have contravened. *Hodel*, 452 U.S. at 331. On the contrary, there are no constitutional assurances of housing with convenient access to certain life opportunities and amenities. *See Lindsey v. Normet*, 405 U.S. 56, 73-74 (1972) (White, J.) (considering whether the challenged law implicates a "fundamental interest[]" in "decent, safe, and sanitary housing" for purposes of an equal protection claim, and concluding that "[w]e are unable to perceive in [the Constitution] any constitutional guarantee of access to dwellings of a particular quality," which is a "legislative, not judicial, function[]"); *Citizens Comm. for Faraday Wood v. Lindsay*, 507 F.2d 1065, 1068 (2d Cir. 1974) ("Since there is clearly no constitutional right of access to a certain quality of housing, plaintiffs must establish that the city's action impinges on a suspect class in order to qualify for the stricter compelling state interest standard.") (citations omitted), *cert. denied*, 421 U.S. 948 (1975); *see also Dandridge v. Williams*, 397 U.S. 471, 484-85 (1970) (Stewart, J.) (noting that even legislation involving the "most basic economic needs of impoverished human beings," like "employment opportunities," does not "affect[] freedoms guaranteed by the Bill of Rights").

This claim also fails to allege that the trailer program involved "suspect classifications." *Hodel*, 452 U.S. at 331. Sex offenders, or even *homeless* sex offenders, do not constitute a

suspect classification. *See U.S. v. LeMay*, 260 F.3d 1018, 1030 (9th Cir. 2001) ("Sex offenders are not a suspect class."), *cert. denied*, 534 U.S. 1166 (2002); *Roe v. Marcotte*, 193 F.3d 72, 82 (2d Cir. 1999) (citing *Artway v. Attorney Gen.*, 81 F.3d 1235, 1267 (3d Cir. 1996), for the proposition that "sex offenders are not a suspect class for purposes of Fourteenth Amendment analysis"); *Kreimer v. Bureau of Police*, 958 F.2d 1242, 1269 n.36 (3d Cir. 1992) ("[T]he homeless do not constitute a suspect class[.]"); *accord Maher v. Roe*, 432 U.S. 464, 471 (1977) (Powell, J.) ("In a sense, every denial of welfare to an indigent creates a wealth classification as compared to nonindigents who are able to pay for the desired goods or services. But this Court has never held that financial need alone identifies a suspect class for purposes of equal protection analysis.").

Absent allegations that the trailer program either infringed on "fundamental rights" or entailed "suspect classifications," the equal protection claim is only subject to rational basis review. *Hodel*, 452 U.S. at 331. Such a review supports the conclusion that the County—confronted with the possibility that certain sex offenders could be left homeless by the County residency restrictions—chose to leverage its available resources to create housing through the trailer program. The County's response to the plight of homeless sex offenders, though perhaps not optimal, was reasonable. It is not within the Court's purview to require or recommend that the County improve the trailer program by, among other things, moving the trailers off prison grounds, facilitating educational or employment opportunities, offering better programs for therapy, or building more shower facilities. Such policy matters are properly left to suitable government officials or legislators to decide. *See Hodel*, 452 U.S. at 331; *Dukes*, 427 U.S. at 303.

### b. Against Roberts

Because the Court finds that Plaintiffs have failed to state an equal protection claim based on the County's trailer program, it also concludes that Roberts, on behalf of CHI, could not, in fact, have committed, or conspired to commit, a violation of the Equal Protection Clause by furnishing transportation to the County trailer site. *See, e.g.*, *Spear v. Town of W. Hartford*, 954 F.2d 63, 68 (2d Cir. 1992) ("To state a claim against a private entity on a Section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor *to commit an unconstitutional act*.") (emphasis added). Thus, the Court need not address the additional arguments that, as against Roberts, the claim fails in that (i) he was neither a state actor nor acting under the color of state law and (ii) the purported conspiracy, in which he participated, was not alleged with any particularity. (*See* Dkt. No. 70-2, at 5-7.)

Accordingly, the Court dismisses with prejudice the entirety of the equal protection claim.[48]

---

[48] Tellingly, Plaintiffs do not even address the equal protection claim in their opposition brief. Rather, with respect to the County's trailer program, Plaintiffs vaguely allude, for the first time, to the claim that the trailer program, which was "physically located" on the secured grounds where "the county jail was also located," constituted false imprisonment in violation of the Fourth Amendment. (Pls. Opp., at 6.) Such a claim is also unavailing. There is no indication that homeless sex offenders, who had nowhere else to go, "did not consent" to receiving shelter through the trailer program, which required them to set foot on prison grounds. *Shain v. Ellison*, 273 F.3d 56, 67 (2d Cir. 2001), *cert. denied*, 537 U.S. 1083 (2002). Based on Plaintiffs' vague allegations, the only involuntary aspect of this situation was the homelessness that certain sex offenders faced and *not* the fact that they agreed to be housed in trailers furnished by the County. Accordingly, the Court dismisses with prejudice any false imprisonment claim made by Plaintiffs.

### 3. Pendent Jurisdiction

Having dismissed the federal constitutional claims over which it had original jurisdiction, the Court declines to assert pendent jurisdiction over the supplemental state law claims of preemption with respect to the County and Town residency restrictions. *See* 28 U.S.C. § 1367(c)(3) (providing that "district courts may decline to exercise supplemental jurisdiction," if "the district court has dismissed all claims over which it has original jurisdiction"). "It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. . . . Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (Brennan, J.); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) (Marshall, J.) (same); *Oneida Indian Nation of N.Y. v. Madison Cnty.*, 665 F.3d 408, 437 (2d Cir. 2011) (same).

Furthermore, where, as here, the supplemental state law claims "raise[] a novel or complex issue of State law," the Court also has the discretion to decline to assert pendent jurisdiction. 28 U.S.C. § 1367(c)(1); *see Carver*, 730 F.3d at 154-55 (declining to exercise pendent jurisdiction, where "the construction of the provision of [the statute] at issue raises an unresolved issue of state law . . . that should be resolved by the New York state courts because the manner in which the statute is construed implicates significant state interests"); *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 124 (2d Cir. 2006) ("We have repeatedly held that a district court particularly abuses its discretion when it retains jurisdiction over state-law claims raising unsettled questions of law following dismissal of all original-jurisdiction claims.") (collecting cases).

Accordingly, in the Court's discretion, the preemption claims are dismissed without prejudice.

III.    <u>Conclusion</u>

The Court, therefore, GRANTS Defendants' motions in *Wallace*.  Plaintiffs' *ex post facto* and other federal constitutional claims are DISMISSED *with* prejudice, and their state law preemption claims are DISMISSED *without* prejudice.  The Clerk of the Court is directed to enter judgment accordingly.


SO ORDERED:


 /s/ Pamela K. Chen     
PAMELA K. CHEN
United States District Judge


Dated: August 28, 2014
      Brooklyn, New York